620 F.2d 1277
 Janice ADAMS and Jack Adams, Jr., minors, by Jerrianne
Adams, their natural guardian and next friend, and Jerrianne
Adams; Catherine M. Neel and Camille A. Neel, minors, by
Catherine Neel, their natural guardian and next friend, and
Catherine Neel; Mary Edington and Susan Edington, minors, by
Horace Edington, their natural guardian and next friend, and
Horace Edington, The Concerned Parents for Neighborhood
Schools, Appellants,
v.
UNITED STATES of America, Appellee,
Board of Education of the City of St. Louis, and Daniel L.
Schlafly, FrederickE. Busse, Gordon L. Benson, Malcolm W.
Martin, Mrs. Anita L. Bond, Mrs. JoyceBowen, Henry M. Grich,
Jr. (Secretary), Rev. James L. Cummings (President),Mrs.
Erma J.Lawrence, Rev. Donald E. Mayer (Vice President),
Lawrence Moser, CharlesHarris, and Julius C. Dix, Benjamin
M. Price, Robert W. Bernthal, David J.Mahan, Charles
Brasfield (School District Superintendents) and Robert E.
Wentz(Superintendent ofSchools), Appellees.
UNITED STATES of America, Appellant,
v.
CITY OF ST. LOUIS, Appellee,
Janice Adams and Jack Adams, Jr., minors, by Jerrianne
Adams, their naturalguardian and next friend, and Jerrianne
Adams; Catherine M. Neel and Camille A.Neel, minors, by
Catherine Neel, their natural guardian and next friend,
andCatherineNeel; Mary Edington and Susan Edington, minors,
by Horace Edington, theirnatural guardian and next friend,
and Horace Edington, The Concerned Parentsfor Neighborhood
Schools, Appellees,
Board of Education of the City of St. Louis, and Daniel L.
Schlafly, FrederickE. Busse, Gordon L. Benson, Malcolm W.
Martin, Mrs. Anita L. Bond, Mrs. JoyceBowen, Henry M. Grich,
Jr. (Secretary), Rev. James L. Cummings (President),Mrs.
Erma J.Lawrence, Rev. Donald E. Mayer (Vice President),
Lawrence Moser, CharlesHarris, and Julius C. Dix, Benjamin
M. Price, Robert W. Bernthal, David J.Mahan, Charles
Brasfield (School District Superintendents) and Robert E.
Wentz(Superintendent ofSchools), Appellees.
Earline CALDWELL, Lillie Caldwell, Denise Daniels, Dwane
Daniels, CedricWilliams, Stephanie Williams, Gloria
Williams, Janis Hutcherson, LeeHutcherson, Robert Smith,
Eddie S. Willis and the National Association for
theAdvancement of ColoredPeople, Appellants,
v.
BOARD OF EDUCATION OF the CITY OF ST. LOUIS and Daniel L.
Schlafly, FrederickE. Busse, Gordon L. Benson, Malcolm W.
Martin, Mrs. Anita L. Bond, Mrs. JoyceBowen, Henry M. Grich,
Jr. (Secretary), Rev. James L. Cummings (President),Mrs.
Erma J.Lawrence, Rev. Donald E. Mayer (Vice President),
Lawrence Moser, CharlesHarris, and Julius C. Dix, Benjamin
M. Price, Robert W. Bernthal, David J.Mahan, Charles
Brasfield (School District Superintendents) and Robert E.
Wentz(Superintendent ofSchools)
and
The State of Missouri, Arthur Mallory, Commissioner of
Education of the Stateof Missouri, The State of
Missouri Board of Education, Appellees.
Craton LIDDELL, a minor, by Minnie Liddell, his mother and
next friend, andMinnie Liddell, Joanna Goldsby, a minor, by
Barbara Goldsby, her mother andnext friend, and Barbara
Goldsby, Deborah Yarber, a minor, by Samuel Yarber, her
father andnext friend, and Samuel Yarber, Nathalie Moore, a
minor, by Louise Moore, hermother and next friend, and
Louise Moore, Rachelle LeGrand, a minor, by LoisLeGrand, her
mother and next friend, and Lois LeGrand, on behalf of
themselvesand all otherschool-age children and their parents
residing in the metropolitan schooldistrict of the City of
St. Louis, Missouri, Appellants,
v.
BOARD OF EDUCATION OF the CITY OF ST. LOUIS, and Daniel L.
Schlafly, FrederickE. Busse, Gordon L. Benson, Malcolm W.
Martin, Mrs. Anita L. Bond, Mrs. JoyceBowen, Henry M. Grich,
Jr. (Secretary), Rev. James L. Cummings (President),Mrs.
Erma J.Lawrence, Rev. Donald E. Mayer (Vice President),
Lawrence Moser, CharlesHarris, and Julius C. Dix, Benjamin
M. Price, Robert W. Bernthal, David J.Mahan, Charles
Brasfield (School District Superintendents) and Robert E.
Wentz(Superintendent ofSchools), Appellees,
and
The State of Missouri, Arthur Mallory, Commissioner of
Education of the Stateof Missouri, The State of
Missouri Board of Education, Appellees.
CITY OF ST. LOUIS, Appellant,
v.
UNITED STATES of America, Appellee,
Board of Education of the City of St. Louis and Daniel L.
Schlafly, FrederickE. Busse, Gordon L. Benson, Malcolm W.
Martin, Mrs. Anita L. Bond, Mrs. JoyceBowen, Henry M. Grich,
Jr. (Secretary), Rev. James L. Cummings (President),Mrs.
Erma J.Lawrence, Rev. Donald E. Mayer (Vice President),
Lawrence Moser, CharlesHarris, and Julius C. Dix, Benjamin
M. Price, Robert W. Bernthal, David J.Mahan, Charles
Brasfield (School District Superintendents) and Robert E.
Wentz(Superintendent ofSchools), Appellees.
 Nos. 79-1468, 79-1470, 79-1471, 79-1477 and 79-1486.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Jan. 16, 1980.
Decided March 3, 1980.
Rehearing Denied April 10, 1980.
 
 Richard B. Fields, Ratner & Sugarmon, Memphis, Tenn., argued, and William E. Caldwell, Memphis, Tenn., David A. Lang, St. Louis University School of Law, St. Louis, Mo., Nathaniel R. Jones, NAACP Gen. Counsel, New York City, and Thomas I. Atkins, Sp. Counsel, NAACP, Boston, Mass., on brief, for appellant, Caldwell.
 William P. Russell, St. Louis, Mo., argued, Joseph S. McDuffie, and William P. Russell, St. Louis, Mo., on brief, for appellant Liddell.
 Charles W. Kunderer, Klutho, Cody & Kilo, St. Louis, Mo., argued, and Jack L. Koehr, City Counselor, St. Louis, Mo., on brief, for appellant, City of St. Louis.
 Anthony J. Sestric, St. Louis, Mo., for appellant, Adams.
 John H. Lashly, Lashly, Caruthers, Thies, Rava & Hamel, St. Louis, Mo., argued, Paul B. Rava, Kenneth C. Brostron, Stephen A. Cooper, Alan D. Pratzel, St. Louis, Mo., on brief, for appellee, Bd. of Ed.
 Sheila K. Hyatt, Legal Counsel, Jefferson City, Mo., argued, and John Ashcroft, Atty. Gen., Jefferson City, Mo., on brief, for appellee, State of Missouri.
 Drew S. Days, III, Asst. Atty. Gen., Brian K. Landsberg, Jessica Dunsay Silver, and Thomas D. Yannucci, Attys., Dept. of Justice, Washington, D. C. and Robert D. Kingsland, U. S. Atty., St. Louis, Mo., for appellee, United States.
 Opinion of the Court by LAY, Chief Judge, and HEANEY, BRIGHT, ROSS, STEPHENSON, HENLEY and McMILLIAN, Circuit Judges.
 
 
 1
 Prior to 1865, Missouri prohibited the creation or maintenance of schools for teaching black children to read or write. In 1865, the state legislature passed laws requiring that separate schools be established for black students. The substance of this legislation was incorporated in the Missouri Constitution of 1945. Separate schools were maintained by the St. Louis Board of Education pursuant to the legislation and the state constitution.
 
 
 2
 Ninety years after Missouri first required separate schools, the United States Supreme Court, in the Brown v. Board of Education decisions, found that segregated school systems were providing an inferior education to black children. It held that such systems must be disestablished with all deliberate speed. As a result of these decisions, the Missouri laws requiring separate schools were repealed or declared inoperative. The St. Louis Board of Education's response to Brown was to adopt a "neighborhood school plan." Now, twenty-six years later, St. Louis elementary and secondary schools remain segregated.
 
 
 3
 The St. Louis Board of Education failed to take effective measures to desegregate the school system in the years immediately following Brown I and has subsequently enforced policies with respect to the assignment of students, the transportation of students, the assignment of personnel and the construction of school facilities which cannot be reasonably explained without reference to racial concerns and which have contributed substantially to continuing segregation in the school system. This failure resulted in the commencement of this action in 1972.
 
 
 4
 Since 1972, the Board of Education has taken some steps to disestablish the dual system. These include the adoption of an incremental faculty desegregation plan and the opening of several specialized and magnet schools, some of which are integrated.
 
 
 5
 In our judgment, these steps, while meaningful, are not adequate to disestablish the existing segregated school system. Something more is clearly required. We thus have no alternative but to again remand this matter to the district court with directions to require the Board of Education, in consultation with the parties, a qualified expert and an interracial committee selected by the district court from all elements of the community, to develop and implement a plan that will integrate the St. Louis public schools.
 
 I. HISTORICAL BACKGROUND
 
 6
 Prior to the Civil war, a Missouri statute provided: "No person shall keep or teach any school for the instruction of negroes or mulattoes, in reading or writing, in this State." Act of February 16, 1847, § 1, 1847 Mo.Laws 103. Beginning in 1865, the Missouri General Assembly enacted a series of statutes requiring separate public schools for blacks. See, e. g., Act of February 17, 1865, § 13, 1865 Mo.Laws 170; Act of June 11, 1889, § 7051a, 1889 Mo.Laws 226. This segregated system was incorporated into the Missouri Constitution of 1945, which specifically provided that separate schools were to be maintained for "white and colored children." See Mo.Const. art. IX, § 1(a) (1945). Although a 1954 Attorney General opinion declared this provision unenforceable following Brown I, it remained a part of the state constitution until repealed in 1976. Statutes implementing the constitutionally mandated segregation provided for separate funding, separate enumerations, separate consolidated "colored" school districts, and the interdistrict transfer of black students. Most of these statutes were not repealed until 1957. See Act of July 6, 1957, § 1, 1957 Mo.Laws 452.
 
 
 7
 In the 1953-1954 school year, the St. Louis school district operated seven white and two black high schools, approximately eighty-three white and forty black elementary schools, and one white and one black vocational/technical school. There were 58,595 white (65.5%) and 30,880 black (34.5%) elementary and high school students attending school in the district.
 
 
 8
 Under the state-mandated segregated system, white students were generally assigned to schools in their neighborhoods. Black students attended black schools in the "core" of the city. Those black students residing outside the "core" were bused into the black schools; for them there were no neighborhood schools.[1] Separate overlapping attendance zones were maintained for black and white students. Black students from some suburban St. Louis County school districts were also bused into the City's black schools because state law and practice prohibited them from attending their local schools. The black schools were staffed by black teachers, administrators and nonprofessionals; the white schools by white personnel.
 
 
 9
 After Brown, the St. Louis Board of Education declared that it would implement a plan designed to desegregate its system. The heart of that plan was said to be the "neighborhood school concept."[2] School attendance zones were redrawn and students were generally assigned to schools close to their homes. The zones were nearly identical with the boundaries of racially identifiable neighborhoods.[3] Moreover, a "continuation transfer" option was made available to all students then enrolled, permitting them to remain in the school in which they were then enrolled until graduation, unless overcrowding would result.
 
 
 10
 The new plan did not change the segregated nature of the St. Louis school system. As detailed in Part IV of this opinion, schools that had all-black student and faculty populations prior to Brown continued to be all black or virtually all black after the 1955 plan went into effect. Most pre-Brown white schools also retained their racial identity. Those pre-Brown white schools located in the black neighborhoods, however, turned virtually all black immediately after the plan was implemented.
 
 II. PROCEDURAL HISTORY
 
 11
 On February 18, 1972, Craton Liddell, his mother, and other members of the Concerned Parents of North St. Louis and their children filed this action in the United States District Court for the Eastern District of Missouri seeking to represent the class of black school children in the St. Louis school system. They alleged that the Board of Education and its administrators had "effected and perpetuated racial segregation and discrimination" in the operation of the public schools of the City of St. Louis, in violation of the Fourteenth Amendment.
 
 
 12
 For more than a year, the parties engaged in discovery proceedings. On October 3, 1973, a class was certified and, by public notice, other interested parties were invited to intervene on or before December 1, 1973. No one accepted the invitation. The defendant Board of Education's motion to join as additional parties defendant the Governor, the State Attorney General, the Commissioner of Education of the State of Missouri, the State Board of Education, the St. Louis County Superintendent of Education, and the twenty school districts in St. Louis County that constitute the first two tiers of districts adjoining the City of St. Louis was also denied without comment by the district court on December 1, 1973.
 
 
 13
 Early in 1974, the district court requested that the parties stipulate as to the undisputed facts. The stipulations were filed on June 7, 1974. Following a year and a half of negotiations, the Liddell group and the Board of Education agreed to a consent decree which was approved by the court on December 24, 1975.[4] The court ordered publication of the judgment and advised that any objections thereto, either by members of the class or by other interested parties, should be filed by January 16, 1976. On that date, objections to the decree were filed by organizations representing St. Louis teachers and by a second group of black parents (Caldwell, et al.), who were joined by the St. Louis Chapter of the NAACP. The Caldwell group moved to intervene.
 
 
 14
 At a hearing, Liddell and the Board of Education defended the consent decree and opposed the motion for intervention. The district court overruled the objections and denied the Caldwell group's motion to intervene on the grounds that the motion was untimely and that the class was adequately represented. The Caldwell group appealed the district court's denial of its motion to intervene. This Court reversed on December 13, 1976. Liddell v. Caldwell, 546 F.2d 768 (8th Cir. 1976). On appeal, we first considered the argument that the Caldwell motion was untimely. The Caldwell group's position was that intervention was appropriate because the group was primarily interested in the remedial issue, an issue that had not yet been fully or adequately resolved. Noting that, "as all agree, (the consent decree did) not constitute the overall plan for desegregation," but represented "only partial steps toward implementing a unitary school system," id. at 771, this Court held that intervention for the purpose of litigating the remedial issue was timely.
 
 
 15
 We turned next to the issue of the adequacy of the class representation. The Caldwell group argued that the plaintiffs had abandoned the original goal of the litigation when they entered into the consent decree. In particular, Caldwell attacked the decree for its failure to require desegregation of the elementary schools and for offering only marginal opportunity for desegregation in grades seven through twelve. Caldwell complained, in essence, that the consent decree ignored the need for meaningful integration. We observed that "if the overall plan to be submitted by the board (in compliance with the consent decree) contains major deficiencies in the respects asserted, the plan will encounter serious constitutional objection." Id. at 773.
 
 
 16
 Since serious questions had been raised concerning the adequacy of the consent decree and because remedial planning was to be an ongoing process, we directed the district court to immediately grant the Caldwell group's petition for intervention. Further, in light of the difficulties of achieving a successful remedy, we suggested that the district court invite the United States Department of Justice and the Missouri State Board of Education to intervene, that a biracial citizens committee be created to aid in the planning of a remedy, and that a voluntary interdistrict solution be investigated. We further directed the district court to hear objections to the Board's forthcoming desegregation plan and to consider any alternative plans submitted by other parties. Finally, we directed that "(i)n no event should implementation of plans for a unitary school system be delayed beyond the commencement of the 1977-78 school term." Id. at 774. The Board of Education promptly filed a petition for certiorari with the United States Supreme Court.
 
 
 17
 On February 25, 1977, the district court granted the Caldwell group leave to intervene.
 
 
 18
 On February 28 and March 10, 1977, the Board of Education submitted a plan for reducing racial segregation in the City's secondary schools. Thereafter, the parties filed their objections to the plan and, in April of 1977, the district court held a hearing. Finding that the only portion of the Board of Education's plan on which there was agreement was that relating to magnet schools, the court ordered the Board to proceed with the implementation of that part of the plan for the school year beginning in September of 1977. The court withheld action on any other aspect of the plan and scheduled further hearings on the plan and its alternatives for July 25, 1977.
 
 
 19
 Later that spring and summer, Liddell, the Caldwell group and the United States Department of Justice (as amicus curiae) submitted alternative plans for the desegregation of the school system. In May, the Caldwell group moved to enforce its plan by injunction.
 
 
 20
 On June 27, 1977, the Supreme Court denied the Board's petition for certiorari. St. Louis Board of Education v. Caldwell, et al., 433 U.S. 914, 97 S.Ct. 2987, 53 L.Ed.2d 1100 (1977). On July 13, 1977, the district court decided, on its own motion, that it was now necessary to determine whether there had been any constitutional violation that would support the imposition of a remedy. The court stated: "This determination has never been made by the consent decree nor the stipulation of facts, and the stipulation of facts denies any constitutional violation by defendants. * * * The remedy to be adopted by the Court will depend on the nature and extent of the constitutional violation, if any." Craton Liddell, et al., and Earline Caldwell, a Minor, et al. v. Board of Education of the City of St. Louis, Missouri, et al., No. 72 C 100(1), slip op. at 2 (E.D.Mo. July 13, 1977).
 
 
 21
 By various orders during the summer of 1977, the United States, the City of St. Louis, Janice Adams, et al. (representing the Concerned Parents for Neighborhood Schools) and Mary Puleo, et al. (representing the Involved Citizens Committee) were allowed to intervene as plaintiffs. The State of Missouri, the Commissioner of Education of the State of Missouri and the State of Missouri Board of Education were added as parties defendant.
 
 
 22
 With the understanding that both liability and remedy were at issue, the case proceeded to trial.[5] The eight parties aligned themselves into two principal groups. One group, Liddell, the Caldwell group and the Department of Justice, took the position that the Board of Education had violated the United States Constitution by its operation of the public schools. Each then argued the merits of its own remedial alternative. The second group, the Board of Education, the State of Missouri, the City of St. Louis and Adams, denied that any constitutional violation had occurred.[6] The Board of Education argued that it had never acted with an intent to segregate and that it was not responsible for any racial segregation found to exist. It agreed, nonetheless, to implement its desegregation plan developed pursuant to the consent decree. The State argued that there had been no violation but that, in any event, it was not responsible and should not be made to participate in any remedy. Puleo did not participate in the trial.
 
 
 23
 On April 12, 1979, the district court handed down its decision. Liddell v. Bd. of Ed., City of St. Louis, Etc., 469 F.Supp. 1304 (E.D.Mo.1979). It found no constitutional violation by the defendants. It concluded that the St. Louis Board of Education had fulfilled its obligation to create a unitary school system in 1955 and 1956 by the adoption of "a neighborhood school policy." It held that the resegregation of the system had resulted from demographic shifts influenced by the policies of the federal government and others, not by the acts or omissions of the Board of Education. Nevertheless, the district court held that the Board of Education was bound by the consent decree. As a guide to continued planning under that decree, the court instructed that
 
 
 24
 (s)ince no constitutional violation has been found, the criteria shall be quality education, which includes integration of the races, where practical and feasible.
 
 
 25
 Id. at 1365.
 
 III. ISSUES ON APPEAL
 
 26
 The principal issues on appeal are: (1) whether the Board effectively desegregated the school system in 1954-1956 by adopting and implementing its neighborhood school plan; (2) whether Board policies or actions since that date have contributed to the present segregated condition of the school system; (3) what policies and actions must now be taken to integrate the St. Louis elementary and secondary schools; and (4) whether certain appellants should be awarded attorney fees.[7]
 
 
 27
 IV. EFFECTIVENESS OF THE 1954-1956 BOARD PLAN
 
 
 28
 The record in the present case clearly establishes that the St. Louis Board of Education's 1954-1956 "neighborhood school plan"[8] had very little, if any, effect on the existing dual school system in the City. The new plan resulted in most of the student population continuing to attend one-race or virtually one-race schools. Although there are few exact figures for the period immediately following implementation of the plan because the Board of Education kept no records of school racial composition from 1955 to 1962, all the available data demonstrates that little desegregation actually occurred in 1954-1956.
 
 
 29
 A 1956 Board of Education report cited 1955 projections indicating that over one-half of the white elementary schools (46 of 83) would have an all-white student population and two-thirds of the black elementary schools (27 of 40) would remain all black immediately following the plan's implementation. The remaining thirteen formerly all-black elementary schools were also projected to remain segregated, with student populations ranging from 82% to 99% black at a time when blacks comprised approximately 35% of the public school population. Cf. Columbus Board of Education v. Penick, 443 U.S. 449, 452, 99 S.Ct. 2941, 2943, 61 L.Ed.2d 666, 673 (1979).
 
 
 30
 The situation was similar in the high schools. A 1962 staff report to the United States Civil Rights Commission stated that the two formerly black high schools, Sumner and Vashon, enrolling more than 3,400 students, remained all black after the plan was implemented. The 1955-1956 populations of the seven formerly white high schools were reported to be as follows:In 1962, the Board of Education again began to keep complete records on the racial composition of schools in the district. Those records corroborate earlier evidence of the segregative effects of the School Board's plan. In that year, all twenty-eight of the formerly black elementary schools still in existence were all or virtually all black; thirty-six other elementary schools were over 90% black. Eighty-one percent of the black students attended schools that were 90% or more black. Similarly, fifty of the formerly white schools remained 85% or more white in 1962 and two-thirds of the white students attended schools that were 90% or more white. The 1962 figures also show that the overall school population and the black percentage of that population had increased since 1954. The 1962-1963 total enrollment was 108,245 55.4% black and 44.6% white.
 
 
 31
 These segregated patterns in student assignments were mirrored in the faculty assignments. Of the twenty-eight pre-Brown black schools still in existence in 1962, twenty-six had faculties that were 100% black. The other two were Sumner High School (98.7% black) and Henry elementary (82.8% black). Moreover, those formerly white schools that had changed student racial identity between 1954 and 1962 tended to change faculty racial identity as well.
 
 
 32
 By the start of the 1979-1980 school year, the district enrollment had decreased to 66,011, while the district-wide percentage of black students had increased to 75.5%. Eighty-two percent of the black students still attend schools that are 90% or more black. Of the 119 regular elementary and secondary schools currently operating in the district, seventy-eight (65.5%) are currently 90% or more black; fourteen (11.7%) are 90% or more white. Thus, 77.3% of the regular schools in the City are now essentially one-race schools.[10]
 
 
 33
 The defendants do not dispute the segregated nature of the St. Louis school system. Instead, they argue that current segregation "is not the result of present or past discriminatory action on their part." See Swann v. Charlotte-Mecklenburg Bd. of Ed., 402 U.S. 1, 26, 91 S.Ct. 1267, 1281, 28 L.Ed.2d 554 (1971). Specifically, defendants assert that they disestablished the dual school system, as required by Brown, when they instituted the "neighborhood school policy"[11] in 1954-1956. The district court agreed with this contention. A careful review of the record and the controlling law, however, convinces us that the district court was clearly in error as to the constitutional requirements imposed on defendants who have formerly discriminated pursuant to state law. It also erred in its evaluation of the extent to which the defendants have met those requirements.
 
 
 34
 The district court erroneously held that the establishment of a neighborhood attendance policy fulfilled the defendants' "affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." See Green v. School Board of New Kent County, 391 U.S. 430, 437-438, 88 S.Ct. 1689, 1693-1694, 20 L.Ed.2d 716 (1968). Neighborhood school policies have been the subject of Supreme Court attention on numerous occasions. The Court has consistently held that merely establishing a facially neutral school assignment system is not sufficient to eliminate the constitutional violation caused by past intentional discrimination. In Swann, the Court stated,
 
 
 35
 All things being equal, with no history of discrimination, it might well be desirable to assign pupils to schools nearest their homes. But all things are not equal in a system that has been deliberately constructed and maintained to enforce racial segregation. * * *
 
 
 36
 * * * "Racially neutral" assignment plans proposed by school authorities to a district court may be inadequate; such plans may fail to counteract the continuing effects of past school segregation resulting from discriminatory location of school sites or distortion of school size in order to achieve or maintain an artificial racial separation. * * * In short, an assignment plan is not acceptable simply because it appears to be neutral.
 
 
 37
 Swann v. Charlotte-Mecklenburg Bd. of Ed., supra, 402 U.S. at 28, 91 S.Ct. at 1282; see Keyes v. School District No. 1, 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973);[12] Clark v. Board of Education of Little Rock School Dist., 426 F.2d 1035 (8th Cir. 1970) (en banc), cert. denied, 402 U.S. 952, 91 S.Ct. 1608, 29 L.Ed.2d 122 (1971). In Davis v. Board of School Commrs., 402 U.S. 33, 37, 91 S.Ct. 1289, 1292, 28 L.Ed.2d 577 (1971), the Court expressly stated that neighborhood school zoning is not "per se adequate to meet the remedial responsibilities of local boards." See also Diaz v. San Jose Unified School Dist., 612 F.2d 411, 416 (9th Cir. 1979) ("The existence of such a (neighborhood) policy is not enough to prove the absence of segregative intent."). Indeed, the Court has gone so far as to question whether a racially neutral policy would ever be adequate to meet a school board's affirmative duty to disestablish a dual school system: "In this remedial process, steps will almost invariably require that students be assigned 'differently because of their race.' * * * Any other approach would freeze the status quo that is the very target of all desegregation processes." McDaniel v. Barresi, 402 U.S. 39, 41, 91 S.Ct. 1287, 1289, 28 L.Ed.2d 582 1971).[13]
 
 
 38
 The record shows that the Board's 1954-1956 plan perpetuated the segregated school system. One School Board document discloses that the results of the 1954-1956 plan were specifically intended. A 1956 report, prepared by the Office of the Superintendent of Instruction, stated that when the 1954-1956 plan was implemented, the school attendance zones were drawn so as to "re-locate the smallest possible number of pupils." Similarly, the post-Brown policy adopted by the School Board was designed to have the least possible impact on the segregated personnel assignments. The policy provided: "Whenever possible, both teaching and non-teaching employees will retain their present assignments." Preservation of the status quo, obviously, meant preservation of a segregated system.
 
 
 39
 Aside from direct statements of intent, there is an abundance of evidence from which segregative intent can be inferred. According to one of the most recent Supreme Court pronouncements on the question, one factor tending to indicate the existence of segregative intent is a school board's "(a)dherence to a particular policy or practice, with full knowledge of the predictable effects of such adherence upon racial imbalance in a school system." Columbus Board of Education v. Penick, supra, 443 U.S. at 465, 99 S.Ct. at 2950, 61 L.Ed.2d at 681. The immediate effects of the St. Louis School Board's 1954-1596 plan were plainly foreseeable by the Board and school administrators. As is graphically portrayed in Appendix II, the 1955-1956 high school attendance zones were drawn so as to correspond, with remarkable consistency, to the racially identifiable residential neighborhoods in the city. Elementary school boundary lines were drawn in a similar fashion. The result was inevitable and unquestionably foreseeable: As detailed earlier, the black schools remained predominately black and the white schools remained predominately white, with very few exceptions.[14]
 
 
 40
 Further evidence of the Board's intent to maintain a segregated school system is the "continuation transfer" policy that was a part of the 1954-1956 plan.[15] The policy provided:
 
 
 41
 Students already enrolled in a school, but not resident in its new district may, but are not required, to continue at that school until they graduate. This privilege will be granted, however, only if the particular school is not overcrowded.
 
 
 42
 The unmistakable intent and effect of this policy was to preserve the pre-Brown system of school assignments.[16] Like the "freedom-of-choice plan" disapproved by the Supreme Court in Green v. School Board of New Kent County, supra, the continuation transfer option virtually guaranteed that the School Board plan would be an ineffective tool of desegregation. See id. 391 U.S. at 440, 88 S.Ct. at 1695.
 
 
 43
 The foregoing demonstrates that the School Board's 1954-1956 plan did not meet the defendants' constitutional duty to disestablish the dual school system in the City of St. Louis. The Supreme Court's conclusion in Columbus is applicable to St. Louis as well: "Whatever the Board's current purpose with respect to racially separate education might be, it knowingly continued its failure to eliminate the consequences of its past intentionally segregative policies. The Board 'never actively set out to dismantle this dual system.' " Columbus Board of Education v. Penick, supra, 443 U.S. at 461, 99 S.Ct. at 2948, 61 L.Ed.2d at 679,[17] quoting the district court's opinion in that case, 429 F.Supp. 229 at 260.
 
 V. POST-1956 SEGREGATIVE ACTS
 
 44
 The dual school system in St. Louis, legally mandated before 1954 and perpetuated by the Board of Education's 1954-1956 desegregation plan, has been maintained and strengthened by the actions of the Board in the years since. The Board's steadfast adherence to a student assignment policy which did not desegregate the schools and its use of intact busing, school site selection, block busing, permissive transfers, and faculty assignments have preserved segregation in the school system.
 
 
 45
 1. Student assignment policies.
 
 
 46
 Perhaps the most significant segregative policy of the St. Louis Board of Education in the years since 1956 has been its adherence to the neighborhood school student assignment policy. Despite the Board's "continuing 'affirmative duty to disestablish the dual school system,' " Columbus Board of Education v. Penick, supra, 443 U.S. at 460, 99 S.Ct. at 2948, 61 L.Ed.2d at 678, quoting McDaniel v. Barresi, supra 402 U.S. at 41, 91 S.Ct. at 1288, the Board has continued a policy that, in 1979, still sends black students to black schools and white students to white schools.[18] This basically segregative policy, moreover, has been enhanced by successive and consistent Board action.
 
 
 47
 The first of these successive actions was the use of intact busing. "Intact busing" is a technique that daily sends an entire class of students, with their teacher, from an overcrowded school to a vacant classroom elsewhere. The technique was used to combat overcrowding in the pre-Brown era with white students being bused to white schools and black students to black schools. Because the 1954-1956 redistricting temporarily reduced overcrowding, intact busing was used sparingly from 1955 to 1957. In 1959, however, intact busing again became significant and over 1,000 students were so bused. This number grew to more than 6,000 by 1963. The bused students were treated administratively as part of the school from which they came rather than the school to which they were sent. Consequently, they often arrived, recessed, ate lunch and departed on different schedules than the other students in the receiving school. They thus became an isolated subset of the school in which they were housed. Significantly, in the post-Brown era most of the students affected by this policy were black students sent to white schools.[19]
 
 
 48
 In 1962, a group of black parents complained about this policy to the Board of Education. Suit and countersuit were filed over the constitutionality of intact busing. These suits were dropped, however, when the opening of new schools and the Board's modification of its policy defused the issue.[20] By 1964, intact busing had ceased.
 
 
 49
 Segregation in student assignment, however, continued. All ten of the new schools that opened in 1964 (thereby reducing the need for intact busing) were between 98.5% and 100% black at the time of opening. This reflects a durable pattern of segregative school construction and opening in the district. Of the thirty-six elementary schools that were either newly constructed or newly opened between 1962 and 1975, thirty-one were over 93% black on opening and four were over 94% white. Only one was integrated to any significant degree. This pattern is contrary to the teachings of the Supreme Court that "the responsibility of the local authorities * * * is to ensure that future school construction * * * (is) not used and (does) not serve to perpetuate * * * the dual school system." Columbus Board of Education v. Penick, supra, 443 U.S. at 460, 99 S.Ct. at 2948, 61 L.Ed.2d at 678.
 
 
 50
 Another practice that had a foreseeable and predictable segregative effect is the Board's post-1964 busing policy. Despite the newly opened schools mentioned above, overcrowding in some schools in the district continued or recurred. The Board of Education responded by busing students from the overcrowded areas to underused facilities. Intact busing was replaced with block busing. See note 20, supra. Significantly, although overcrowding occurred in both black and white schools, and both black and white schools were available for transfer, there has been black-to-black, black-to-white and white-to-white busing, but very little white-to-black busing. Of the 3,190 black students bused because of overcrowding in 1973, 81% were bused to schools that were over 75% black. Similarly, of the 575 whites bused because of overcrowding, 85% were sent to schools that were over 94% white. Only twenty-seven whites (4.7% of the whites bused because of overcrowding) were sent to predominately black schools.
 
 
 51
 The district court specifically found that 63.7% of the blacks bused for overcrowding in 1974-1975 were assigned to schools that were between 90% and 100% black; 67% were similarly assigned in 1975-1976. Liddell v. Bd. of Ed., City of St. Louis, Etc., supra at 1337. The court noted that one reason that there was not more racial mixing in these transfers was that the overcrowded black schools were in far north St. Louis while the white schools were located in the south. It concluded that "(n)othing improper can be inferred from busing students to closer schools." Id. We cannot agree. First, the record simply does not sustain the finding that the differences in distance were significant. Second, "the measure of the post-Brown conduct of a school board under an unsatisfied duty to liquidate a dual system is the effectiveness, not the purpose, of the actions in decreasing or increasing the segregation caused by the dual system. * * * As was clearly established in Keyes and Swann, the Board had to do more than abandon its prior discriminatory purpose." Dayton Board of Education v. Brinkman, 443 U.S. 526, 538, 99 S.Ct. 2971, 2979, 61 L.Ed.2d 720, 734 (1979). In alleviating overcrowding, the Board authorized substantial student transportation. This transportation could have been used to help establish a unitary school system in St. Louis. Instead, it was used to perpetuate a dual system. Any findings to the contrary are clearly erroneous.
 
 
 52
 The permissive transfer policy also served to perpetuate segregation in the St. Louis school system. Originally adopted in the hope that it would help ameliorate the segregative consequences of neighborhood schools, the policy allowed students to transfer out of their assigned school to other schools in which space was available. Until 1974, however, parents had to assume responsibility for providing transportation. As a result, affluent white students were able to transfer away from integrated school assignments to all-white schools. In 1974, the policy was amended so that the school district provided transportation. Nevertheless, the policy had a segregative effect for many years.
 
 
 53
 2. Faculty and administrator segregation.
 
 
 54
 The perpetuation of a dual school system may be manifested not only in student assignment policies but also in the assignment of teachers and administrators. "Independent of student assignment, where it is possible to identify a 'white school' or a 'Negro school' simply by reference to the racial composition of teachers and staff, the quality of school buildings and equipment, or the organization of sports activities, a prima facie case of violation of substantive constitutional rights under the Equal Protection Clause is shown." Swann v. Charlotte-Mecklenburg Bd. of Ed., supra, 402 U.S. at 18, 91 S.Ct. at 1277.
 
 
 55
 Before 1954, teachers and administrators were segregated by law. After Brown, the express policy of the Board was to maintain then-current teaching assignments. In addition, the acknowledged resistance of some school principals and the community was found by the district court to "have limited the degree of racial mixing of school faculties." Liddell v. Bd. of Ed., City of St. Louis, Etc., supra, at 1346. Indeed, racial segregation of faculties has been as pervasive as student segregation.
 
 
 56
 In 1962, only thirty-three of the system's 1,272 black elementary school teachers taught in schools with less than a 90% black student enrollment, and only thirty-four of the 283 black high school and vocational teachers were assigned to schools that were less than 99% black. Ten years later, during the 1972-1973 school year, thirty elementary schools still had all-white faculties, twenty-seven elementary schools still had all-black faculties and ninety-one faculties were at least 90% one race. And this was at a time when the faculty was 46.4% white, 53.6% black district-wide.
 
 
 57
 The district-wide pattern of faculty segregation is dramatized by the assignment of faculty to newly opened schools. Eleven of the schools opening since 1962 had faculties that were 100% black upon opening, four had faculties that were 100% white and only four had faculties that were between 40% and 60% black. The evidence clearly indicates that black faculty members were assigned primarily to black schools and that white faculty members were assigned to white schools.
 
 
 58
 The distribution of black administrators throughout the district reflects a similarly race-conscious assignment pattern. The central office was desegregated by 1973. In the district offices, however, administrators were clearly assigned on the basis of race. The Central-Vashon and Beaumont-Sumner districts, which were predominately black, were staffed 100% black at the district level; the Cleveland-Southwest District, nearly all white in student population, was staffed 100% white at the district office. Further, there were no black administrators in racially identifiable white schools.
 
 
 59
 The district court, while acknowledging this pattern, concluded that the racial composition of faculty and administration did not influence the racial composition of the school. "Racial identifiability of schools is not now and was not in the past a result of the Board's failure to mandatorily achieve more racially balanced faculty." Liddell v. Bd. of Ed., City of St. Louis, Etc., supra at 1347 (footnote omitted). Rather, the district court assigned exclusive responsibility for the racial identifiability of schools to the City's demographics. Id. We cannot agree. The record contains substantial expert testimony indicating that public perception of the racial identity of a school can be maintained as effectively by a one-race faculty as by a one-race student body and public perception of the racial identity of a school can be, and often is, a powerful factor in shaping the residential patterns of a neighborhood. By maintenance of a segregative faculty assignment policy, the St. Louis Board of Education encouraged the perpetuation of its dual school system.
 
 
 60
 VI. OTHER FACTORS CONTRIBUTING TO SEGREGATION
 
 
 61
 The district court, having erroneously concluded that the Board of Education discharged its duty to desegregate the St. Louis school system by adopting a neighborhood school plan and by refraining from discriminatory actions thereafter, went on to find that factors over which the Board of Education had no control are substantially responsible for today's segregation in the St. Louis school system. The most important factor is said to be the dramatic change in the demography of the City. These demographic changes were found by the district court to have been caused by discriminatory housing, urban renewal and highway land acquisition policies of the federal government; state laws and policies mandating discrimination in housing;[21] discriminatory private policies, including red-lining and separate newspaper listings for "colored" housing; and general population movements unrelated to any specific governmental policies.
 
 
 62
 The initial problem with this finding is that it is based on the two erroneous conclusions noted in the preceding paragraph. The second problem is that it is not supported by the record. The facts are that most schools in the heart of North St. Louis were black in 1954 and remain black today, and that most schools in South St. Louis were white in 1954 and remain white today. The Board of Education has simply never dealt with this overwhelming reality. If the Board had dealt with the problem in 1954-1956 and had implemented a plan for integrating the schools in North and South St. Louis, we would have a different case today. We would have to examine the question from an entirely different point of view. See Pasadena City Bd. of Educ. v. Spangler, 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976). But it did not; the schools remain segregated and we have no choice but to adopt a practical remedy to achieve an integrated school system.
 
 
 63
 We do recognize that many of the factors cited by the court, including actions of the state and federal governments, have intensified racial segregation in North St. Louis. We have taken this fact into consideration in determining the appropriate remedy in this case. We have no alternative but to require a system-wide remedy for what is clearly a system-wide violation.
 
 VII. THE REMEDY
 
 64
 Segregation in the elementary and secondary schools in St. Louis must now be eliminated. An integrated system must be devised and implemented promptly. In no other way can the constitutional right to an equal educational opportunity be assured to all children of St. Louis. With careful planning, expert advice, broad community participation and good faith, a plan to integrate the schools can be devised and implemented which will meet constitutional requirements.
 
 
 65
 1. Remedial alternatives proposed by the parties.
 
 
 66
 The major focus of the plan submitted by the Board of Education is the creation of junior high schools. Three or more junior high schools would be opened each year over a period of four years and as many of these as possible would be assigned equal numbers of black and white students. At this ratio of assignment, there would necessarily be some all-black junior high schools remaining. All the junior high schools would be aligned into feeder patterns designed to reduce racial isolation in the high schools.
 
 
 67
 The Board also proposed the creation of a new Business and Office Magnet High School, two specialty high schools, the expansion of enrollment at Metro High School and the conversion of O'Fallon Technical High School to a full-day comprehensive technical high school with an enrollment policy aimed at securing "appropriate representation of both races." The Board further proposed that the racially isolated schools be associated for special projects and activities, the purpose being to provide opportunity for significant interracial contacts and experiences. These proposals were designed to provide some racial mixing for the remaining all-black and all-white schools. The Board additionally suggested that it undertake a feasibility study of an Educational Park, designed to house a variety of magnet and specialty high schools. It expressed the hope that the Park could be studied, designed and built in about four years.
 
 
 68
 The Board's plan did not purport to integrate grades kindergarten through six. The plan did provide, however, for the establishment of seven magnet elementary schools with proposed enrollments of 50% white and 50% black students. These magnet schools would offer various educational alternatives to the traditional classroom setting in the City's regular elementary schools. These schools, together with two magnet high schools, were established pursuant to the district court's order in April of 1977. The specialty and magnet schools currently enroll about 13% of the City's school population. The racial goals established by the Board for its magnet and specialty schools have not been met.[22]
 
 
 69
 The Board finally urged that if something more was required to desegregate the schools, the district court should require a metropolitan plan encompassing the neighboring two tiers of schools in St. Louis County. It argued that only such a plan would stabilize the schools in the City and the metropolitan area.
 
 
 70
 The Caldwell group proposed a plan prepared by Dr. Michael J. Stolee, Dean of Education at the University of Wisconsin, Milwaukee. Under the Stolee plan, using the techniques of pairing, clustering and boundary adjustments, each elementary and secondary school in the system would be brought into rough conformity with the overall 75% black-25% white racial mix of the school district. Schools whose existing black-white ratio is within 15% of the district-wide ratio would be unaffected by the plan. Under the plan, the high schools were projected to have from 63% to 80% black students; the elementary schools to have between 51% and 85% black students.
 
 
 71
 The original plaintiffs proposed a plan prepared by Dr. David L. Colton, Associate Professor of Education at Washington University, St. Louis. The Colton plan would convert the St. Louis public school system from a two-tier system (kindergarten through eight and nine through twelve) to a four-tier one (kindergarten through three, four through six, seven through nine and ten through twelve). The first tier schools would continue as "neighborhood schools." Second tier students would be housed in the same building as the first tier. Assignments to the second tier would be made to achieve a 55% black-45% white student population in as many second tier units as possible. The remaining second tier units would enroll only black students. Third tier students would be housed in existing school buildings adopted for use as junior high schools. The student assignment pattern for these schools would be designed to achieve a racial distribution of 60% black and 40% white. There would be no all-white junior high schools but approximately one-third of the junior high schools would continue to enroll only black students. Fourth tier students would be housed in seven high schools. Five of these schools would have a 60% black-40% white racial mix. Two would be all black. Student assignments would be made so that no student would attend both an all-black junior and senior high school. Every black student would thus receive at least one-third of his or her education in grades four through twelve in an integrated environment. Every white student would be in an integrated school after the third grade. The City's special education programs would be combined with those in St. Louis County, and a desegregation planning group with representation from all groups in the community would be established. This planning group would focus on teacher training, administrative reassignment, community support and student response.
 
 
 72
 The United States Department of Justice took the position that either the Stolee plan or the Colton plan would desegregate the present dual school system. It also stated that integration could be achieved if a plan was developed in accordance with the views of its expert witness, Dr. Gary Allen Orfield. Dr. Orfield testified: (1) that currently integrated schools should be left alone and every effort should be made to stabilize them for the foreseeable future;[23] (2) that all white schools, and as many black schools as possible, should be integrated with a substantially even relationship (50% black-50% white) between minority and majority children, and that this be done at every grade level, but particularly at the elementary level;[24] (3) that specialized programs should be included in the neighborhood schools so that parents are assured that their children will not be locked in a slow-moving curriculum; (4) that free choice, intra and inter-district transfers should be permitted, particularly for black students who would be left in all-black schools[25] and that positive educational components should be built into the plan; (5) that magnet schools and specialty schools should be continued and made available to both City and suburban students, but only as an adjunct to a comprehensive desegregation plan;[26] (6) that school personnel should be integrated at every level of employment and be assigned in a way that will not racially identify schools; and (7) that the community should be deeply involved in developing, explaining and policing the integration plan.
 
 
 73
 Dr. Orfield agreed with the Board of Education that an inter-district remedy funded by the State of Missouri would have the best chance of permanently integrating the schools in the metropolitan St. Louis area.[27]
 
 
 74
 2. The constitutionally permissible alternatives.
 
 
 75
 The plan proposed by the Board of Education will not effectively desegregate the public schools of St. Louis. It does little or nothing to integrate grades one through six. Black elementary schools will remain black and white elementary schools will remain white. Further, the plan unnecessarily delays desegregation at the junior and senior high school levels the junior high schools would be integrated over a four-year period, the high schools over a seven-year period. These time periods are simply unacceptable after a delay of twenty-five years. Similarly, the Board's tentative proposal to establish an Educational Park at the high school level is a futuristic solution to a current problem. While such an institution could serve us a useful component of an otherwise valid plan, the tentative proposal to open a Park four years hence is inadequate to meet the constitutional requirement to desegregate now. In short, the Board's plan offers too little too late.
 
 
 76
 The Stolee plan would desegregate both the elementary and the secondary schools, at least temporarily. The district court found, however, that the probable result of the implementation of the plan would be an all-black school system in a few years. In light of this finding, we do not require that the Stolee plan be implemented, but the Board remains free to adopt the plan, or those portions of it, that meet the constitutional standards set forth herein.
 
 
 77
 Having made these observations with respect to the Board's plan and to the Stolee plan, we have no alternative but to remand to the district court with instructions to take those steps necessary to bring about an integrated school system in accordance with the guidelines and time tables set forth below:
 
 
 78
 a. The Board of Education is to be given the principal responsibility for developing and implementing a comprehensive plan to integrate the school system.[28] In fulfilling this responsibility, the Board shall work with the parties of this lawsuit, a broadly based interracial committee to be named by the district court and an expert, or experts, to be named by the district court. The Board shall be required to submit to the district court its plan for integrating the school system within sixty days of the issuance of this Court's mandate. The district court shall promptly review the plan to ensure that it complies with the mandate of this Court. The plan shall be implemented no later than the beginning of the 1980-1981 school year under the direction of the district court.
 
 
 79
 b. Voluntary techniques will not effectively desegregate the St. Louis school system. See Liddell v. Caldwell, supra at 772, note 8. The Board is, therefore, to be required to develop a system-wide plan for integrating the elementary and secondary schools of the district. On the basis of this record, two approaches appear to be constitutionally permissible and practical. See Davis v. Board of School Commrs., 402 U.S. 33, 91 S.Ct. 1289, 28 L.Ed.2d 577 (1971).
 
 
 80
 (1) The Colton approach. If this approach is to be followed, it must be modified so that all four tiers will be integrated. This modification may require an adjustment in the black-white ratios suggested by Colton.[29] Black students must be given a substantially equal opportunity to attend integrated schools during the years they attend the public schools.
 
 
 81
 (2) The Orfield approach. If this approach is to be followed, the boundary lines and assignment patterns for schools that are presently integrated shall remain substantially as they are at present. See United States v. School District of Omaha, 521 F.2d 530, 546-547 (8th Cir.), cert. denied, 423 U.S. 946, 96 S.Ct. 361, 46 L.Ed.2d 280 (1975). For this purpose, a school with a black enrollment of between 30% and 50% shall be considered to be integrated.[30] The student populations of these schools shall be maintained at as close to these percentages as is possible for a reasonable period not to exceed five years.[31] The remaining white schools (those made than 70% white) in the district shall be integrated with a sufficient number of black schools to achieve student populations that are not to be less than 30% nor more than 50% black. The student populations of these schools shall also be maintained at these percentages to the extent possible for a reasonable period not to exceed five years. The integration may be accomplished by those techniques that have been approved by the Supreme Court or this Court. The burdens of integration shall be borne as equally as possible by blacks and whites. Davis v. Board of School Commrs., supra 402 U.S. at 37, 91 S.Ct. at 1292; Swann v. Charlotte-Mecklenburg Bd. of Ed., supra 402 U.S. at 25, 91 S.Ct. at 1280; United States v. School District of Omaha, supra at 547.
 
 
 82
 c. Each approach has its strengths and weaknesses. Unfortunately under either approach, some all or virtually all-black schools in North St. Louis will remain. The Board shall use other techniques to ensure students in all schools will receive equal educational opportunities. It shall seek the help of the state and federal governments in financing them.[32] These techniques may include the following:
 
 
 83
 (1) Developing and implementing compensatory and remedial educational programs. See Milliken v. Bradley, 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977).
 
 
 84
 (2) Developing and implementing programs providing less than full-time integrated learning experiences.
 
 
 85
 (3) Developing and implementing a comprehensive program of exchanging and transferring students with the suburban school districts of St. Louis County. The Board shall seek the cooperation of such school districts, the State Board of Education and the United States in developing and implementing such a plan. See Liddell v. Caldwell, supra at 774.
 
 
 86
 (4) Maintaining existing magnet and specialty schools, and establishing such additional schools as needed to expand opportunities for an integrated education.
 
 
 87
 (5) Establishing an Educational Park.
 
 
 88
 (6) Continuing and expanding a policy of permissive transfers in the district.
 
 
 89
 d. No inter or intra-district permissive transfer shall be permitted which will increase the segregated nature of either the sending or receiving school. See Booker v. Special School Dist. No. 1, Minneapolis, Minn., 351 F.Supp. 799, 811 (D.Minn.1972).
 
 
 90
 e. Transportation costs incurred pursuant to the provisions of an approved plan will be paid by the Board of Education.[33]
 
 
 91
 f. The consent decree, insofar as it pertains to faculty integration, shall be fully implemented and additional steps taken to ensure that school personnel at every level will be integrated.
 
 
 92
 g. It shall be the responsibility of the district court to assure that "future school construction and abandonment are not used and do not serve to perpetuate or re-establish the dual system." Swann v. Charlotte-Mecklenburg Bd. of Ed., supra 402 U.S. at 21, 91 S.Ct. at 1279. Accordingly, any construction of new schools, or addition to old schools other than that contemplated in the plan, shall be submitted to the district court for approval. See Booker v. Special School Dist. No. 1, Minneapolis, Minn., supra at 811.
 
 
 93
 h. The district court shall retain jurisdiction to ensure that the plan effectively integrates the entire St. Louis school system and to ensure that the plan is, in fact, being carried out. To assist the court in its monitoring function, the court's order should include reporting provisions requiring that reports on the operation of the plan be filed periodically with the court for a period of at least three years.
 
 
 94
 3. Attorneys' fees.
 
 
 95
 The Liddell group "and other intervening plaintiffs" requested that the district court allow them their costs and attorneys' fees. The record is unclear as to whether the Caldwell group was among those making such a request. The district court denied all of these requests, apparently on the theory that none of the plaintiffs prevailed below. Liddell v. Bd. of Ed., City of St. Louis, Etc., supra at 1366, 1390. Both the Liddell and Adams groups appeal this denial, claiming that they are entitled to attorneys' fees under 42 U.S.C. § 1988. On the basis of our holdings on the merits, we affirm the denial as to the Adams group and reverse as to the Liddell group. On remand, the district court shall determine reasonable attorneys' fees for the Liddell group (and for the Caldwell group, if they requested them) in accordance with the general principles set forth in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974). See also Cleverly v. Western Elec. Co., 594 F.2d 638 (8th Cir. 1979); Brown v. Bathke, 588 F.2d 634 (8th Cir. 1978).
 
 
 96
 The appellants requesting attorneys' fees on appeal shall submit a motion to that effect within thirty days of the filing of this opinion. Documentation of their claims shall be included. The appellees shall then be given fifteen days in which to file their objections to these motions.
 
 
 97
 Reversed and remanded for further proceedings consistent with this opinion. The mandate of this Court shall issue forthwith.
 
 Appendix to follow.APPENDIX I
 
 98
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLEAPPENDIX II
 
 
 99
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLEAPPENDIX III
 
 
 100
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 
 [1]
 See Appendix I
 
 
 [2]
 At trial, St. Louis School Superintendent Robert E. Wentz, defined a neighborhood school as "a school that serves a specific geographic area defined usually in fairly close proximity to that school, the immediate area around that school."
 
 
 [3]
 See Appendix II
 
 
 [4]
 The consent decree is set out in full as Appendix B to the district court's opinion, Liddell v. Bd. of Ed., City of St. Louis, Etc., 469 F.Supp. 1304, 1387 (E.D.Mo.1979). The decree explicitly stated that nothing therein was to be deemed an admission by the Board of Education that the plaintiffs' allegations were true. It did include, however, an admission that "segregation is present, as a matter of fact, in the Public School System of the City of St. Louis * * *." Id. at 1389. To remedy that segregation, the decree required the Board of Education "to take affirmative action to secure unto plaintiffs their right to attend racially nonsegregated and nondiscriminatory schools * * * and * * * to take the affirmative action hereinafter set forth." Id. The decree then required the Board to (1) progressively desegregate its faculty so that, in 1976-1977, 10%, in 1977-1978, 20%, and in 1978-1979, no less than 30% of the teachers and staff in each school would be of the minority race in that school; (2) consider the objective of eradicating segregation when making decisions regarding the construction or closing of schools; (3) make a study, to be submitted to the court in January of 1977, on the realignment of elementary feeder schools to high schools to reduce segregation at the high schools, and (4) make a report to the court on whether magnet elementary schools and special subject high schools would be of assistance in eliminating segregation and on the feasibility of system-wide curriculum improvement. Jurisdiction over the case was retained by the district court
 
 
 [5]
 We note that the lengthy trial produced over 7,000 pages of transcript and about 1,200 exhibits which both expanded and supplemented the facts set forth in the stipulation filed more than three years before trial. The district court considered the entire record as do we
 
 
 [6]
 Adams and the City also argued that the court had no authority to enforce the consent decree because no violation had occurred. They have again made that argument in their appeal to this Court. The district court considered this position "untenable." Liddell v. Bd. of Ed., City of St. Louis, Etc., supra at 1365. In light of our disposition of this case, we have no occasion to consider the argument
 
 
 [7]
 An additional issue on appeal is whether the district court erred in holding moot Adams' contention that the Board's policy regarding admission to the magnet schools discriminated against white nonpublic students. The district court held the question to be moot because the policy was abandoned in the 1978-1979 school year. Liddell v. Bd. of Ed., City of St. Louis, Etc., supra at 1354. We agree
 
 
 [8]
 The Board of Education notes that, besides the neighborhood school policy, its 1954-1956 plan included educational programs for parents and faculty, and inter-school visitations and lectures for the students designed to lessen racial tension. We have no reason to doubt that the Board took whatever steps it could to lessen conflict within the school system and community but these steps did not fulfill the defendants' constitutional duty to disestablish the dual system. Indeed, it appears from the record that, in the interest of avoiding conflict, the Board took steps to ensure that no significant desegregation occurred
 The Board also emphasizes that schools with city-wide enrollment, such as Harris Teachers College and special elementary schools for handicapped students, were desegregated pursuant to the 1954-1956 plan. This fact, however, does not in any way excuse the Board's failure to desegregate the regular elementary and secondary schools in the City.
 
 
 [9]
 The number of white students at Southwest is estimated based on 1953-1954 student enrollment figures
 
 
 [9]
 The number of white students at Southwest is estimated based on 1953-1954 student enrollment figures
 SCHOOL NO. WHITE NO. BLACK % BLACK
--------- ------------ --------- -------
Southwest 1,583[9] 0 0 %
Cleveland 1,476 7 0.4%
Roosevelt 1,791 29 1.5%
Beaumont 1,792 98 5 %
McKinley 1,437 211 13 %
Central 1,034 167 14 %
Soldan 1,000 350 26 %
 ------------ --------- -------
 10,083 862 7.9%
 
 
 [10]
 See Appendix III detailing enrollment statistics for 1975-1976. Statistics for 1979-1980 have been filed with this Court by the defendant School Board
 
 
 [11]
 Under the 1954-1956 Board plan, students were assigned to schools close to their homes. In that sense, the plan was a "neighborhood" plan. The boundary lines for the high schools, however, were drawn so as to assign the students living in the predominately black neighborhoods to the two pre-Brown black high schools. See Appendix II. Following implementation of the School Board plan, both of these schools opened with 100% black enrollments. The elementary school boundaries were also drawn so that the schools remained highly segregated
 An examination of the maps and population statistics in this record makes it clear that the Board could have, without sacrificing the neighborhood concept, drawn the boundaries so as to include significant numbers of white students in the formerly all-black schools. A reading of the record also makes clear, however, that strong community opposition has prevented the Board from integrating the white children of South St. Louis with the black children of North St. Louis.
 
 
 [12]
 In Keyes, the Supreme Court stated:
 Our Brother Rehnquist argues in dissent that Brown v. Board of Education did not impose an "affirmative duty to integrate" the schools of a dual school system but was only a "prohibition against discrimination" "in the sense that the assignment of a child to a particular school is not made to depend on his race . . . ." Infra, at 258. That is the interpretation of Brown expressed 18 years ago by a three-judge court in Briggs v. Elliott, 132 F.Supp. 776, 777 (D.C.1955): "The Constitution, in other words, does not require integration. It merely forbids discrimination." But Green v. County School Board, 391 U.S. 430, 437-438, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968), rejected that interpretation insofar as Green expressly held that "School boards . . . operating state-compelled dual systems were nevertheless clearly charged (by Brown II ) with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." Green remains the governing principle.
 Keyes v. School District No. 1, 413 U.S. 189, 200 n.11, 93 S.Ct. 2686, 2693, 2694 n.11, 37 L.Ed.2d 548 (1973).
 
 
 [13]
 The School Board relies on several Sixth Circuit cases upholding neighborhood assignment policies that resulted in foreseeably racially imbalanced schools. See Higgins v. Board of Education of City of Grand Rapids, 508 F.2d 779 (6th Cir. 1974); Deal v. Cincinnati Board of Education, 419 F.2d 1387 (6th Cir. 1969); Deal v. Cincinnati Board of Education, 369 F.2d 55 (6th Cir. 1966). These cases are easily distinguished from the present case. First, neither Higgins nor Deal involved a completely new neighborhood system with redrawn attendance zone boundaries; both Cincinnati and Grand Rapids had used a neighborhood school system for many years. More importantly, neither Higgins nor Deal involved a situation in which segregation had been imposed by law until the time of Brown
 
 
 [14]
 Despite this persuasive evidence, the district court concluded that the 1954-1956 plan "did not have the foreseeable consequence of bringing about or maintaining segregation," primarily because "(t)he massive changes in the racial makeup of the City in the late 1950's and 1960's were not foreseeable by the Board." This conclusion is clearly erroneous. The Board knew that when its plan was implemented, the white schools in South St. Louis would remain white and the black schools in the "core" area of the City would remain black. If the Board had fulfilled its constitutional duty in 1954-1956 and the schools were thereafter resegregated by massive changes in the racial makeup of the City, we would have another case
 
 
 [15]
 Former Superintendent William Kottmeyer testified that "a good many" white students exercised the continuation transfer option in order to remain in predominately white schools. The 1962 Civil Rights Commission report stated that over 40% of the black students assigned to schools other than the ones to which they had previously been assigned elected to remain in their former schools
 
 
 [16]
 The School Board asserts that the continuation transfer option was simply the extension of a long-standing policy that permitted a student to remain in a given school even though he moved his residence out of that school's attendance zone. We disagree. That policy, which would benefit the School Board by helping to keep the enrollment level at each school constant, is obviously not the same as the transfer policy included in the 1954-1956 plan. The latter policy, which would aid the School Board in no way other than to reduce public outcry by ensuring that no significant desegregation occurred, allowed students to defeat the purpose of the plan by electing to remain in their former school after the Board had changed the attendance zones for those schools
 
 
 [17]
 The defendants assert that the 1954-1956 Board plan was widely acclaimed by civil rights leaders. For example, the author of the 1962 Civil Rights Commission Report, Wylie H. Davis, described the 1954-1956 transitions as "solidly conceived and brilliantly carried off." We find no reason to disagree with the Davis statement. The problem is that the "transitions" he spoke of did not desegregate the school system. A careful reading of the report reveals that Mr. Davis recognized that the School Board plan had very little effect on the segregated nature of the school system despite the hopes some may have had for the new policies
 
 
 [18]
 As we noted earlier, 82% of the black students currently attend "neighborhood" schools that are more than 90% black
 
 
 [19]
 The district court found that the "intact busing policy had a disproportionate impact on black children * * * because black children * * * were bused more often than whites." Liddell v. Bd. of Ed., City of St. Louis, Etc., supra at 1336. It did not, apparently, consider the fact that the black students so bused were maintained as separate entities in the host white schools as a part of the impact of this technique on the black students. This despite the fact that Dr. Clifford P. Hooker, an expert witness appearing for the Board of Education, acknowledged the detrimental effects of intact busing on both black and white children. Cf. Jackson v. Marvell School District No. 22, 425 F.2d 211 (8th Cir. 1970) (overturning "desegregation" plan that required students to remain with the teacher they had under segregated system)
 
 
 [20]
 The modification replaced intact busing with block busing, whereby students from certain blocks in the overcrowded school's attendance zone were bused to other schools and incorporated into those schools. As implemented, this policy, too, was to have segregative effects, as detailed later in this opinion
 
 
 [21]
 The court stated:
 Prior to 1954 a pattern of racial housing segregation prevailed in the City and discriminatory restrictions against blacks were enforced by the courts and agencies of the State of Missouri. Dolan et al. v. Richardson et al., 181 S.W.2d 997 (Mo.App.St.L., 1944); Shelley v. Kraemer, 355 Mo. 814, 198 S.W.2d 679 (en Banc, 1946) rev'd, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1947); and Jones v. Alfred H. Mayer Co., 255 F.Supp. 115 (E.D.Mo.1966), aff'd, 379 F.2d 33 (8th Cir. 1967), rev'd, 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968).
 Liddell v. Bd. of Ed., City of St. Louis, Etc., supra at 1323. We note the date of the Jones v. Alfred H. Mayer Co. decision and add that some suburban communities in Missouri continue to try to enforce discriminatory housing restrictions against blacks. See Park View Heights Corp. v. City of Black Jack, 605 F.2d 1033 (8th Cir. 1979); United States v. City of Black Jack, 508 F.2d 1179 (8th Cir. 1974), cert. denied, 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975); Park View Heights Corp. v. City of Black Jack, 467 F.2d 1208 (8th Cir. 1972).
 
 
 [22]
 In the current school year (1979-1980), the secondary magnet school populations are approximately 65% black, and the elementary magnet schools range from 58% to 93% black. The special secondary schools range from 66% to 100% black, and the special elementary schools, excluding Lutheran Hospital, ranged from 15% to 100% black
 
 
 [23]
 Dr. Orfield testified that
 when you have an integrated neighborhood with an integrated school, you should never close that school; * * * you don't bus children into that school, and you should do everything possible to continue to keep it as an integrated school, and to get people to notice that if they move into that neighborhood, they're not going to be moving into a transitional neighborhood, but they're going to be moving into one that has a stably integrated school.
 
 
 [24]
 Dr. Orfield testified that it is best to begin the integration process in the first grade. He also testified that it is ill-advised and unworkable to start desegregation at the junior high level. He stated:
 If you visit schools, you find a lot more difficulty in junior highs where students are generally in a difficult passage point in life anyway than you find in elementary schools which are much, much easier to desegregate.
 * * * (T)here is also * * * stark evidence that the educational advantages from desegregation are through the schools that are * * * desegregated * * * from the first grade, so if I were going to choose one aspect of a school system to desegregate, junior high would probably be the last one, * * * the elementary schools would be the first one.
 * * * (T)here are many reasons why this is probably true. One is that children in the first grade have very little achievement gap compared to what they have later.
 Another is that they have very little racial consciousness * * *.
 Other expert witnesses agreed that black children will achieve academic gains in an integrated school, particularly at the elementary level. They disagreed as to the extent of the gains and whether there would be gains if the integrative experience occurred only at the junior high school level. The experts also agreed that white students did not suffer an achievement loss in an integrated school setting. See R. Crain & R. Mahard, DESEGREGATION AND BLACK ACHIEVEMENT (1977), wherein seventy-three studies on the effect of desegregation on black achievement were reviewed. "A majority of these studies conclude that desegregation has a beneficial effect on black achievement test scores. * * * A comparison of the 73 studies leads to one important conclusion: that desegregation is noticeably more likely to have a positive impact on black test scores if it begins in the earliest grades, and effects are especially likely to be positive for first graders." Id. at Abstract. See also Pettigrew, Useem, Normand & Smith, Busing: A Review of "The Evidence," THE PUBLIC INTEREST, Winter 1973, at 88.
 
 
 [25]
 Dr. Orfield testified that
 to encourage cross-district transfers, * * * there (should) be * * * (a) right to transfer to vacant spaces in the suburbs and also positive educational alternatives (should be) built into metropolitan area on a voluntary basis * * *.
 The major limitation is that voluntary transfer plans never have a broad system-wide effect, but (they) would * * * be important (and would) give an opportunity to more children * * * to (begin) to develop some kind of in(t) er-racial contacts with some of the suburban school systems.
 
 
 [26]
 Dr. Orfield testified:
 (A) Magnet School plan is a very feasible, workable approach to desegregation in a small city with a small ghetto or barrio (community) * * * .
 A Magnet School plan in itself has never been successful in desegregating a big city. It almost always produces no significant white transfers into predominantly black or Latino schools. * * * (I)t will not produce substantial desegregation without a compulsory plan backing it.
 * * * (I)t is valuable in desegregation because it builds in educational choice for parents, and * * * you ought to take advantage of it in any good desegregation plan * * *.
 * * * Milwaukee, for example, has desegregated about two-thirds of its schools * * * largely through voluntary transfers because parents know that if they don't transfer voluntarily they'll be reassigned.
 
 
 [27]
 Dr. Orfield testified:
 (T)he most stable kind of plan is a metropolitan-wide proportional enrollment plan * * *.
 Anything that can be done to involve the suburban districts should be done.
 In Milliken v. Bradley, 418 U.S. 717, 744-745, 94 S.Ct. 3112, 3127, 41 L.Ed.2d 1069 (1974), the Supreme Court stated that, in order for an inter-district remedy to be appropriate,
 it must first be shown that there has been a constitutional violation within one district that produces a significant segregative effect in another district. Specifically, it must be shown that racially discriminatory acts of the state or local school districts, or of a single school district have been a substantial cause of inter-district segregation.
 St. Louis County suburban school districts, pursuant to state law prior to Brown, collaborated with each other and with the City of St. Louis to ensure the maintenance of segregated schools. See Act of April 9, 1917, 1917 Mo. Laws 498 (repealed 1957) (providing for the "Colored Consolidated High School District" of St. Louis County); Act of February 17, 1865, § 13, 1865 Mo. Laws 170 (repealed 1957) (providing, inter alia, for the inter-district transfer of "colored children"). Included among the pre-Brown practices of these districts was the assignment and transportation of black students living in the suburbs to black schools in the City. Moreover, as noted in Part VI of this opinion, governmental policies may have intensified segregation in the St. Louis area. See U. S. v. Bd. of Sch. Com'rs of City of Indianapolis, 541 F.2d 1211 (7th Cir. 1976), vacated and remanded, 429 U.S. 1068, 97 S.Ct. 800, 50 L.Ed.2d 786 (1977), reconsidered, 573 F.2d 400 (7th Cir.), cert. denied, 439 U.S. 824, 99 S.Ct. 93, 58 L.Ed.2d 116 (1978), on remand, 456 F.Supp. 183 (S.D.Ind.1978); Newburg Area Council, Inc. v. Board of Ed., Jefferson Cty., Ky., 489 F.2d 925 (6th Cir. 1973), vacated and remanded, 418 U.S. 918, 94 S.Ct. 3208, 41 L.Ed.2d 1160 (1974), reconsidered, 510 F.2d 1358 (6th Cir. 1974), cert. denied, 421 U.S. 931, 95 S.Ct. 1658, 44 L.Ed.2d 88 (1975), further proceedings sub nom. Cunningham v. Grayson, 541 F.2d 538 (6th Cir. 1976), cert. denied, 429 U.S. 1074, 97 S.Ct. 812, 50 L.Ed.2d 792 (1977); Evans v. Buchanan, 393 F.Supp. 428 (D.Del.), aff'd, 423 U.S. 963, 96 S.Ct. 381, 46 L.Ed.2d 293 (1975), further proceedings, 416 F.Supp. 328 (D.Del.), stay denied, 424 F.Supp. 875 (D.Del.), appeal dismissed, 429 U.S. 973, 97 S.Ct. 475, 50 L.Ed.2d 579 (1976), modified and remanded, 555 F.2d 373 (3d Cir.) (en banc), cert. denied, 434 U.S. 880, 98 S.Ct. 235, 54 L.Ed.2d 160 (1977), on remand, 447 F.Supp. 982 (D.Del.), aff'd, 582 F.2d 750 (3d Cir. 1978) (en banc, petition for cert. filed, 48 U.S.L.W. 3097 (U.S. Oct. 20, 1978) (Nos. 78-671, 78-672).
 
 
 [28]
 The costs of the plan shall be apportioned among the defendants as determined by the district court. See Part VI of this opinion
 
 
 [29]
 Compulsory attendance at the kindergarten level is not required. Students attending this grade need not be included in the plan
 
 
 [30]
 The district court found that "stable integration in a particular school is generally achieved only when the percentage of blacks remains below 50%." Liddell v. Bd. of Ed., City of St. Louis, Etc., supra at 1327. The expert testimony in this record indicates that the factors affecting the stability of an integrated school are numerous and vary from community to community. Among the important factors cited by the experts are: the availability and costs of other alternatives; the extent to which the integrated school system is supported by school administrators, faculty and community groups and leaders; and the quality of education offered in the integrated schools. On this record, we cannot disagree with the district court that a black student population at or below 50% in each school will contribute to the preservation of a racially unified school system in St. Louis
 The record also contains persuasive testimony that integration will be successful only if minority students are represented in numbers sufficient to reduce the feelings of racial isolation. While this number cannot be fixed precisely, we are convinced from this record as a whole that minority populations must be maintained at least at the 30% level.
 
 
 [31]
 In view of the long period of racial discrimination in the St. Louis schools, a short period of mandatory stabilization is required to enable the desegregation plan to be effective. The time schedule imposed by this opinion is not a long-term "inflexible requirement." See Pasadena City Bd. of Educ. v. Spangler, supra 427 U.S. at 434, 96 S.Ct. at 2703
 
 
 [32]
 The consent decree required the parties to study the feasibility of curriculum improvements to improve the quality of education throughout the system. We require that this study be continued and that compensatory and remedial programs be instituted
 
 
 [33]
 We note that federal funds may be available to the school district to help defray the cost of this transportation under the Emergency School Aid Act. At oral argument, the State's attorney assured the Court that state aid would also be available and would pay up to 80% of the district's student transportation costs. See Mo.Ann.Stat. § 163.161 (1979)