Craton LIDDELL, et al.

v.

The BOARD OF EDUCATION OF the CITY OF ST. LOUIS, MISSOURI, et al.

Earline CALDWELL; Lillie Caldwell; Gwendolyn Daniels; and National Association for the Advancement of Colored People, Appellants,

v.

SPECIAL SCHOOL DISTRICT OF ST. LOUIS COUNTY, Appellee,

The Affton Board of Education; The Bayless Board of Education; The Brentwood Board of Education; The Clayton Board of Education; The Ferguson–Florissant Board of Education; The Hancock Place Board of Education; The Hazelwood Board of Education; The Jennings Board of Education; The Kirkwood Board of Education; The Ladue Board of Education; The Lindbergh Board of Education; The Maplewood–Richmond Heights Board of Education; The Mehlville Board of Education; The Normandy Board of Education; The Parkway Board of Education; The Riverview Gardens Board of Education; The Rockwood Board of Education; The University City Board of Education; The Valley Park Board of Education; The Webster Groves Board of Education; and The Wellston Board of Education, Appellees.

No. 87–2445.

United States Court of Appeals, Eighth Circuit.

Submitted May 18, 1988.

Decided July 14, 1988.

William L. Taylor, Washington, D.C., for appellants.

John Gianoulakis, St. Louis, Mo., for appellees.

Before HEANEY, McMILLIAN and FAGG, Circuit Judges.

PER CURIAM.

The National Association for the Advancement of Colored People (NAACP) appeals a district court order refusing to require the appellees, St. Louis County school districts, to provide specific data to it and the Voluntary Interdistrict Coordinating Council (VICC). The requested data would permit a comparison of black city students attending county schools with resident students in the areas of: scholastic performance, demotions and retention in grade, college acceptances, achievement test scores, special education, extra-curricular activities, and discipline. The NAACP contends that the Settlement Agreement, which governs the transfer of black city students to the county schools, requires the release of this data in order to determine whether the transfer students have received non-discriminatory treatment.

We hold that the district court did not abuse its discretion in refusing to require the county school district to submit the requested information on the resident students. The district court stated that it was denying the request *at this time*, thus indicating that it would reconsider the matter if circumstances changed and additional information became necessary.

The data currently available on the city to county transfer program are quite extensive. The data reveal that:

1) A high degree of integration has been achieved in the county schools. Approximately 12,000 black city students have enrolled in county schools. This number is expected to increase significantly in the 1988–89 school year and the goal of 15,000 students should be reached in the near future. The following table indicates the degree of integration in 1983 and 1987:

RACIAL COMPOSITION OF
COUNTY SCHOOLS

| School District | October 1983 | October 1987 |
|---|---|---|
| Affton | 4.6% | 15.55% |
| Bayless | 4.3% | 15.49% |
| Brentwood | 25.0% | 26.26% |
| Clayton | 8.6% | 17.18% |
| Hancock | 6.5% | 16.14% |
| Hazelwood | 17.5% | 25.42% |
| Kirkwood | 20.6% | 26.00% |
| Ladue | 16.0% | 26.32% |
| Lindbergh | 4.2% | 15.80% |
| Mehlville | 2.0% | 9.98% |
| Parkway | 4.4% | 18.16% |
| Pattonville | 7.7% | 20.66% |
| Ritenour | 16.9% | 27.50% |
| Rockwood | 1.9% | 11.90% |
| Valley Park | 5.4% | 23.00% |
| Webster | 22.3% | 25.50% |

VICC, Progress Report, L(1684)87, at 16 (Nov. 4, 1987).

Ten school districts have achieved the planned ratios or goals established under the Settlement Agreement. Of the remaining six districts, four have applied for final judgment and two are working to meet the required ratios.

2) The high level of city to county transfers has been achieved, even though 26% of the city students transferring to the county are required to spend more than two hours a day on a school bus.

3) Black parents and black students appear to give strong support to the program. The St. Louis Post–Dispatch conducted a poll in the winter of 1988 which included a survey of transfer students and their parents. See St. Louis Post–Dispatch, Desegregation, Fifth Year Report (February 22, 1988). For example, 88% of the transfer parents say their children like attending school in the County. Seventy-four percent of the parents of transfer students favor an expansion of the program to allow county schools to accept more transfer students. Only 23% of the transfer students and 6% of the parents of transfer students thought that transfer students did not exhibit "a lot of school spirit and pride in their county schools." Seventy percent agreed, and only 10% disagreed, with the statement that, "I am really learning a lot about going to school with whites because of going to school in the county."

4) There are some indications that black students attending county schools are doing better scholastically than they were before this Court's en banc order of 1983.[1]

5) Information has been gathered, at the direction of the district court, on the disciplining of black transfer students in the county schools. See VICC, Discipline Report, L(1810)88 (March 2, 1988). This information indicates that the suspension rate for students varied greatly among the schools.[2] It also reveals that districts having the lower suspension rates had strong components of instructional and classroom management, a sensitivity to the multicultural population, programs to meet special needs of students, principals who do not rely on cyclical or repeated suspensions, extensive orientation for new students, intervention centers and curricular programs which have ongoing assessment and reporting procedures.

The report further indicates that the school districts having the highest rate of suspension were those having the lowest number of black students initially and which had rapid increases in the percentage of transfer students.

The report recommended measures to reduce the withdrawal rates. These include improved counselling, improved communication with parents and teachers, improved transportation services and the implementation of host family programs.

In light of the district court's continuing concern with student discipline and the recommendations made to meet this problem in those districts with high suspension rates, it would be counter-productive, at this time, to require that comparative data be obtained for resident students. If the suspension rates do not decline in those schools where they now appear high, we are confident that the district court will take the necessary steps to determine whether the higher rate may be due to discriminatory treatment.[3]

1. The St. Louis Post–Dispatch Poll reported that students, parents, and teachers stated that the transfer students do benefit academically from the interdistrict program. St. Louis Post–Dispatch, Desegregation, Fifth Year Report (Feb. 22, 1988).

2. SUSPENSION RATES OF TRANSFER STUDENTS

| High Suspension Rate | | Low Suspension Rate | |
|---|---|---|---|
| Affton | 49.4% | Brentwood | 3.4% |
| Bayless | 34.6% | Clayton | 1.0% |
| Lindbergh | 33.4% | Kirkwood | 4.0% |
| Rockwood | 36.2% | Ladue | 1.3% |
| Valley Park | 56.5% | Webster Groves | 3.3% |

VICC Discipline Report, at 13.

3. It should also be noted that there is recourse for a single student, or small groups of students,

With respect to the academic performance of students, the data is fragmentary. On the basis of the record submitted to this Court, up-to-date information on transfer students concerning demotions, retention in grade, college acceptances and achievement test scores is not available. Such data on transfer students can be readily obtained and should be made available to the parties to this action. At this time, however, we do not believe the district court abused its discretion in refusing to require detailed information on resident students. The most important thing is to determine whether the transfer students have made academic improvements in the county schools. On remand, therefore, the district court shall enter an order:

1. Requiring each county school district to furnish each year to the VICC the scholastic records of transfer students who have been enrolled in their district for two or more years.

2. Requiring the Board of Education of the City of St. Louis to provide any scholastic records which it has of these same transfer students who have been enrolled in the county schools for two or more years. (The scholastic records obtained from the county and City of St. Louis school districts shall include test scores, grades, college acceptance rates, and other measures of scholastic achievement commonly maintained.)

3. Making available to the VICC from a source or sources to be determined by the district court sufficient resources to collate, analyze, and report the scholastic data reported to it. The district court, in its discretion, may conduct an evidentiary hearing before fixing financial responsibility on one or more of the parties to this action for the expense incurred by the VICC. Each school district, however, will be expected to furnish the required information at its own expense.

With scholastic achievement records in hand, it can be determined whether the individual students are benefiting scholastically as a result of the transfer. If the information on individual students indicates that students are not progressing well in one or more districts, the district court will be free to order further studies to determine whether the students in that particular school district are being treated fairly.

The plan for integrating the schools of St. Louis and St. Louis County is a comprehensive one, one important element of which is the plan to transfer some 15,000 black students to county schools. This transfer was directed to assist in the goal of achieving an integrated school system in the city. However, it also had the salutory effect of integrating the county schools as well. Other elements of the en banc Court's plan are equally important and must be fulfilled. Thus, class size in city schools is to be reduced in the all-black elementary and middle schools to 20 students per class by the beginning of the 1988–89 school year. *See Liddell v. Board of Educ.*, 823 F.2d 1252, 1254 (8th Cir. 1987). Six thousand additional students are to be enrolled in the interdistrict magnet schools in the city, *id.* at 1256, and a comprehensive program of school physical improvements to be implemented. (It appears that such a program has been approved by the district court and is under way.)

If all of the components of the plan are fulfilled in good faith, then the school children of the City of St. Louis and the County can look forward to a quality integrated education.

We, therefore, affirm and remand for action consistent with this opinion.

with complaints about their treatment by any of the county schools. The Settlement Agreement established a grievance procedure for transfer students and their parents. That procedure provides that the Recruitment and Counseling Centers, along with the host district, should hear grievances concerning the "treatment" of trans- fer students. If the dispute is not resolved, the VICC convenes a mediation panel to conduct non-binding arbitration. If the mediation panel cannot resolve the dispute, the grievant may seek a legal remedy, including the judicial enforcement of the Settlement Agreement. *See* Settlement Agreement, Section IX.O.