**United States Court of Appeals**
**FOR THE EIGHTH CIRCUIT**

---

No. 97-2009

---

Michael C. Liddell, a minor, by
Minnie Liddell, his mother and next
friend; Kendra Liddell, a minor,
by Minnie Liddell, her mother and next
friend; Minnie Liddell; Roderick D.
LeGrand, a minor, by Lois LeGrand,
his mother and next friend; Lois
LeGrand; Clodis Yarber, a minor, by
Samuel Yarber, his father and next
friend; Samuel Yarber; Earline Caldwell;
Lillie Caldwell; Gwendolyn Daniels;
National Association for the
Advancement of Colored People;
United States of America;

    Plaintiffs-Appellees;

City of St. Louis;

        Plaintiff;

      v.

The Board of Education of the City of
St. Louis; Hattie R. Jackson, President,
Board of Education of the City of St.
Louis; Rev. Earl E. Nance, Jr., a
member of the Board of Education of
the City of St. Louis; Renni B. Shuter,

       Appeal from the United States
       District Court for the
       Eastern District of Missouri.

a member of the Board of Education; *
of the City of St. Louis; Paula V. *
Smith, a member of the Board of Educa- *
tion of the City of St. Louis; Dr. Albert *
D. Bender, Sr., a member of the Board *
of Education of the City of St. Louis; *
Eddie G. Davis, a member of the Board *
of Education of the City of St. Louis; *
Eddie G. Davis, a member of the Board *
of Education of the City of St. Louis; *
Dr. John P. Mahoney, a member of the *
Board of Education of the City of St. *
Louis; Marybeth McBryan, a member *
of the Board of Education of the City *
of St. Louis; Thomas M. Nolan, a *
member of the Board of Education of *
the City of St. Louis; William Purdy, a *
member of the Board of Education of *
the City of St. Louis; Robbyn G. Wahby, *
a member of the Board of Education of *
the City of St. Louis; Madye Henson *
Whithead, a  member of the Board of *
Education of the City of St. Louis; *
Dr. Cleveland Hammonds, Jr., Super- *
intendent of     Schools for the City of St. *
Louis;                            *
                                  *
      Defendants-Appellees; *
                                  *
Ronald Leggett, St. Louis Collector of *
Revenue;                          *
            Defendant;     *
                                  *
State of Missouri; Mel Carnahan, *
Governor of the State of Missouri; *
Jeremiah (Jay) W. Nixon, Attorney *
General; Bob Holden, Treasurer; *

2

Richard A. Hanson, Commissioner of
Administration; Robert E. Bartman,
Commissioner of Education; Missouri
State Board of Education, and its
members; Thomas R. Davis; Gary M.
Cunningham; Sharon M. Williams;
Peter F. Herschend; Jacqueline D.
Wellington; Betty E. Preston; Russell V.
Thompson; Rice Pete Burns;  *
                              *
      Defendants-Appellants; *
                              *
Special School District of St. Louis
County; Affton Board of Education;
Bayless Board of Education; Brentwood
Board of Education; Clayton Board of
Education; Ferguson-Florissant Board
of Education; Hancock Place Board of
Education; Hazelwood Board of
Education; Jennings Board of Education;
Kirkwood Board of Education; LaDue
Board of Education; Lindbergh Board of
Education; Maplewood-Richmond
Heights Board of Education; Mehlville
Board of Education; Normandy Board
of Education; Parkway Board of
Education; Pattonville Board of Educa-
tion; Ritenour Board of Education;
Riverview Gardens Board of Education;
Rockwood Board of Education;
University City Board of Education;
Valley Park Board of Education;
Webster Groves Board of Education;
Wellston Board of Education; St. Louis
County; Buzz Westfall, County
Executive; James Baker, Director of
Administration, St. Louis County,

3

Missouri; Robert H. Peterson, Collector
of St. Louis County "Contract Account,"
St. Louis County, Missouri;                  *
                                             *
        Defendants-Appellees;                *
                                             *
The St. Louis Career Education               *
District;                                    *
                                             *
                        Defendant;           *
                                             *
St. Louis Teachers' Union, Local 420,        *
AFT, AFL-CIO;                                *
                                             *
        Intervenor Below.                    *

_____

Submitted:  July 17, 1997

Filed:  September 25, 1997

_____

Before MCMILLIAN, HEANEY, and FAGG, Circuit Judges.

_____

HEANEY, Circuit Judge.

The State of Missouri (State) appeals from an April 10, 1997 order of the United States District Court for the Eastern District of Missouri denying the State's motion to end all efforts to recruit and admit new students into the voluntary interdistrict transfer plan (VITP) for the 1997-98 school year. The State contends that the district court acted contrary to the United States Supreme Court's decision in Missouri v. Jenkins, 115 S. Ct. 2038 (1995) (Jenkins III) in denying its motion. We do not believe that it did.

On April 23, 1996, the district court appointed Dr. William H. Danforth as settlement coordinator with the responsibility and authority to conduct conferences with all persons involved in the case, to secure the services of experts, and to stimulate negotiations among the parties.  Dr. Danforth continues in this capacity as of the date of this opinion.  Moreover, the district court has under consideration a motion by the State to have the St. Louis School District declared unitary.  Given the long history of state-mandated, segregated schools, the complexity of the issues, and the difficulty of developing a plan that will ensure that students of all races will have a continuing equal opportunity for a quality, integrated education, the district court did not abuse its discretion in denying the State's motion to phase out the voluntary transfer of black city students to county districts pending settlement negotiations.  We encourage the parties to proceed diligently with their negotiations and believe that the settlement coordinator should be permitted to complete this important assignment.  We urge the district court to ascertain the status of the negotiations, and in the event the negotiations reach an impasse, the district court should promptly rule on the pending unitary status motion.  We affirm the order of the district court.

**Background**

The early history of this litigation is chronicled in our earlier opinions and will only be summarized here.[1]

---

[1]See Liddell v. Board of Educ., 882 F.2d 298 (8th Cir. 1989); Liddell v. Board of Educ., 873 F. 2d 191 (8th Cir. 1989); Liddell v. Missouri, 731 F.2d 1294 (8th Cir.)

In 1972, the plaintiffs brought an action against the Board of Education of the City of St. Louis (City Board) alleging that the city schools were segregated by race as a matter of state law and practice.  Thereafter, the State of

(en banc), <u>cert. denied</u>,  469 U.S. 816 (1984) (<u>Liddell VII</u>); <u>Liddell v. Board of Educ.</u>, 677 F.2d 626 (8th Cir.), <u>cert. denied</u>, 459 U.S. 877 (1982) (<u>Liddell V</u>); <u>Liddell v. Board of Educ.</u>, 667 F.2d 643 (8th Cir.), <u>cert. denied</u>, 454 U.S. 1081 (1981) (<u>Liddell III</u>); and <u>Adams v. United States</u>, 620 F.2d 1277 (8th Cir.) (en banc), <u>cert. denied</u>, 449 U.S. 826 (1980).

Missouri was joined as a party defendant. The plaintiffs and the United States as amicus submitted desegregation plans to the district court. The district court held a trial and found no constitutional violation. We reversed, holding that prior to 1865 the State prohibited the creation or maintenance of schools for teaching black children to read or write and that, after that date until 1980, the City Board and the State were jointly responsible for maintaining a segregated school system. Adams v. United States, 620 F.2d 1277, 1280 (8th Cir.) (en banc), cert. denied, 449 U.S. 826 (1980).[2] We further noted that the City Board and the State failed to take effective measures to desegregate the school system in the years immediately following Brown v. Board of Education, 347 U.S. 483 (1954). We remanded the matter to the district court with directions to develop and implement a plan to integrate the St. Louis public schools.

On remand, the district court ordered the implementation of a mandatory desegregation plan within the city schools with funding to be shared equally by the City Board and the State. The district court directed the City Board and the State to develop and submit plans to alleviate the segregated conditions within the city schools through interdistrict transfers between the city and the suburban school districts. Liddell v. Board of Educ., 491 F. Supp. 351 (E.D. Mo. 1980). The Liddell and Caldwell plaintiffs (representing black parents and students) and the Adams plaintiffs (representing white

---

[2]Only one party, the Adams plaintiffs, petitioned the Supreme Court for a writ of certiorari. The State did not file a petition.

parents and students) appealed.[3]  The State contended that it should not be required to pay any of the costs of integration and specifically challenged paragraph 12 of the district court's order which provided:

---

[3]The Liddell plaintiffs contended that the plan did not go far enough to remedy the defendants' discriminatory practices; and the Adams plaintiffs contended that the district court had gone too far in its St. Louis School District reassignment plan.

12. The State defendants, the United States, and the St. Louis Board of Education are ordered and directed as follows:

    a) To make every feasible effort to work out with the appropriate school districts in the St. Louis County and develop, for 1980-81 implementation, a voluntary, cooperative plan of pupil exchanges which will assist in alleviating the school segregation in the City of St. Louis, and which also insures that inter-district pupil transfers will not impair the desegregation of the St. Louis school district ordered herein, and submit such plan to the Court for approval by July 1, 1980.

Id. at 353. We affirmed, noting that "the voluntary exchanges contemplated by section [12](a) must be viewed as a valid part of the attempt to fashion a workable remedy within the City." Liddell v. Board of Educ., 667 F.2d 643, 651 (8th Cir.), cert. denied, 454 U.S. 1081 (1981).

On August 24, 1981, the district court added eighteen St. Louis County suburban school districts (County Districts) as parties defendant and entered various other orders relating to desegregation of the city schools. The County Districts, the State, and the City Board appealed. The State contended that it could not be required to implement a remedy affecting County Districts until a hearing had been held. The Adams plaintiffs contended the district court could order the State to consolidate city and county schools if necessary to effectuate desegregation of the city schools and that

9

these actions could be taken without additional hearings or liability findings.  The City Board argued that the district court orders were not reviewable.  We held that the court order adding additional parties was not appealable.  We stated:

> The district court has yet to issue an order that impacts any of the county schools or units of government.  Thus, we are being asked not to rule on a specific plan but to anticipate what the district court may have in mind and to instruct it as to what it can or cannot do.  The most that can be said

10

is that the district court has indicated in one or more of its orders that it may take actions which impact significantly on St. Louis County school districts.

Liddell v. Board of Educ., 677 F.2d 626, 641 (8th Cir.), cert. denied, 459 U.S. 877 (1982). We remanded to the district court for action consistent with our opinion.

On August 6, 1982, the district court entered an order in which it disclosed that if it held a hearing and found that the County Districts had committed constitutional violations that contributed to the segregation of the St. Louis School District, it would order the consolidation of the city and county schools. The court scheduled interdistrict liability hearings. Before the hearings were held, however, the City Board, the Liddell plaintiffs, the Caldwell plaintiffs, and all eighteen County Districts entered into a settlement agreement that settled the plaintiffs' interdistrict claims against the eighteen County Districts. The agreement provided for voluntary interdistrict transfers between city and county schools and included fiscal incentives to be funded by the State to encourage the transfers. Each district receiving sufficient transfers within five years to satisfy its desegregation obligations would receive a final judgment.[4] The State, having been found to be the primary constitutional violator, was ordered to fund the transfer of city

_____

[4]The settlement agreement further provided "that after a school district receives an order granting it final judgment, it has a continuing obligation to: 'cooperate in the recruitment and promotion of transfers . . . .'" Liddell v. Board of Educ., 96 F.3d 1091, 1094 (8th Cir. 1996) (quoting Appellants' Jt. App. at 108).

11

students to the County Districts. We affirmed the district court in an en banc opinion and set forth our reasons in great detail. <u>Liddell v. Missouri</u> (<u>Liddell VII</u>), 731 F.2d 1294, 1301-09 (8th Cir.) (en banc), <u>cert. denied</u>, 496 U.S. 816 (1984).[5]

---

[5]In a subsequent opinion, <u>Liddell v. Board of Educ.</u>, 851 F.2d 1104, 1105 (8th Cir. 1988), we noted that 12,000 black students were then enrolled in the County Districts. This number has remained relatively constant up to the present. The County Districts state in their current briefs that they are willing to continue to accept the voluntary transfers under the terms of the settlement agreement. Most, if not all, of the County Districts have achieved the plan ratios or goals established under the settlement agreement.

In <u>Liddell v. Board of Education</u>, 873 F.2d 191, 192 (8th Cir. 1989), the State appealed from a district court order "clarifying the extent of Missouri's funding obligations for interdistrict student transfers in the . . . desegregation case." It took the position that when a County District had achieved its designated plan ratio, the State was no longer required to pay for transfers. The State sought further clarification of its funding obligation. We stated:

> Missouri's obligation is to fund interdistrict transfers necessary to reach 15,000 students--no more, no less. . . . The parties agree the total number of students currently attending county schools under the interdistrict transfer program is less than 15,000. Thus, Missouri's obligation to fund interdistrict transfers has not yet been fulfilled. Insofar as the district court's order restoring state funding complies with this portion of our opinion, we affirm. Furthermore, the parties shall take whatever steps are necessary to ensure that 15,000 city students are enrolled in the county schools. In light of the parties' progress to date, this goal is attainable, and it must be achieved at the earliest opportunity.

<u>Id.</u> at 194. No petition for a writ of certiorari was filed. We were asked to clarify our opinion a few months later. We again stated:

> 1. Missouri is obligated to fund voluntary transfer students up to a total of 15,000, regardless of any individual county district's Plan Ratio and/or Plan Goal attainment. . . .
>
> 2. The state's obligation to fund the voluntary transfer of students will continue

13

until such time as the state is relieved of that obligation.

Liddell v. Board of Educ., 882 F.2d 298, 299 (8th Cir. 1989).  Again, no petition for a writ of certiorari was filed.

In October 1991, the State filed the first of three motions to declare the St. Louis School District unitary, terminate desegregation funding, and release all defendants from court supervision. The United States, the City Board, and the plaintiffs responded that consideration of unitary status was premature. The State did not reply to the responses. Instead, it filed a new motion on May 7, 1992, requesting partial unitary status. The district court held that while the State's request was premature, the State was entitled to answers to certain discovery requests because a future declaration of unitary status might be warranted. The State did not appeal this ruling to this court.

In November 1993, the State filed an amended motion for unitary status. It informed the court that it would be prepared to present evidence in support of its amended motion within one year. Eleven months later the State asked the district court for a hearing date on its motion for unitary status. On February 28, 1995, the district court scheduled a hearing for September 1995. This hearing was later rescheduled for March 1996.

On January 4, 1996, while the unitary status motion was still pending, the State filed a motion to terminate the VITP on the basis of Jenkins III. It described its motion as conditional and not ripe for court action because it desired a ruling on its motion only if the court failed to enter a finding of unitary status following the hearing scheduled for March 1996. The City Board and the plaintiffs requested that the hearing on unitary status be postponed while the State's Jenkins III motion was adjudicated. The plaintiffs, joined by the

15

United States, alternatively requested that the court appoint a settlement coordinator to resolve the litigation without the need for trial. The State again requested that the _Jenkins III_ issue be addressed only after a hearing on its unitary status motion and then only if the unitary status motion was not granted in full.

On February 15, 1996, the court denied the State's _Jenkins III_ motion as not ripe. It also denied the request to postpone the hearing on unitary status and decided that the

appointment of a settlement coordinator would be more
beneficial after a hearing on the State's unitary status
motion had been held.  The court stated that:

> [It] agreed with plaintiffs that the best
> resolution of this case would be an agreed-upon
> plan for ending Court supervision of the St.
> Louis Public Schools.  The Court however is
> reluctant to continue the hearing.  It may well
> be that the possibility for settlement will be
> greater following the hearing, at which time the
> appointment of a Settlement Coordinator would be
> appropriate and beneficial.

G(1939)96 at 2.  The State did not appeal the order
denying its Jenkins III motion.

In March 1996, following extensive discovery, the
district court conducted a three-week unitary status
hearing.  Following the hearing, it appointed Dr. William
H. Danforth, former Chancellor of Washington University
of St. Louis, as the settlement coordinator.  It gave the
coordinator broad powers designed to stimulate
negotiations and directed the parties and their counsel
to attend all meetings scheduled by the settlement
coordinator and to participate in good faith in the
negotiations.  It ordered "that all components of the
settlement agreement now in force shall continue as they
are currently operating."  G(2062)96.

On June 26, 1996, the district court, responding to
a motion by the State, held that settlement negotiations
would be kept confidential, that  the settlement
coordinator should not recommend to the court how the
case should be resolved, and refused to set a time limit

17

for the parties to continue negotiations, indicating it was confident that the settlement coordinator would proceed with all diligence.  G(2134)96.

On July 24, 1996, the State appealed district court orders G(2062)96 and G(2134)96, and sought a stay of the interdistrict component of the desegregation remedy pending appeal of the order appointing the settlement coordinator.  It sought alternative remedies limiting its obligations under the desegregation plan.  The district

18

court denied motions for a stay pending appeal on August 14, 1996.  G(2175)96.  This court and Justice Thomas, as Circuit Justice, denied substantially similar motions for a stay.  The State again appealed the denial of the stay motion.  This court consolidated and then dismissed all pending appeals.  We noted that G(2062)96 and G(2134)96 were interlocutory and related to settlement procedures and case management and could not be characterized as appeals from orders denying an injunction.  We stated that "[a] district court, particularly in school desegregation cases, has broad discretion to control its docket and has the necessary flexibility to shape remedies that adjust public and private needs." Liddell v. Board of Educ., 105 F.3d 1208, 1212 (8th Cir. 1997).  With respect to G(2175)96, we stated:

> The State argues that the district court erred because it effectively denied its motion for unitary status.  We disagree.  The district court has yet to rule on the State's unitary status motion.  The district court in this case has not refused to rule on the State's motion that the St. Louis School District be declared unitary.  It has simply postponed post-hearing briefing and deferred final ruling on this matter.  We cannot review a matter that has not been ruled on by the district court.  We lack jurisdiction over the State's claim that the district court has erroneously denied its motion for unitary status.

Id.  The State filed a petition for rehearing en banc; that petition was denied on May 7, 1997.  No petition for a writ of certiorari was filed.

19

On March 14, 1997, the State moved the district court for an order directing that all parties immediately cease efforts to recruit and admit new students into the VITP and relieve the State from any funding obligations with respect to such students. The State made the same argument in this motion as it made in <u>Liddell v. Board of Education</u>, 105 F.3d 1208 (8th Cir. 1997), that the VITP violates <u>Jenkins III</u>. On April 10, 1997, the district court denied the State's motion, stating that it did so for the

reasons set forth by the responses of certain county districts, the United States, the Caldwell-NAACP plaintiffs, and the City Board.  The State now appeals.[6]

## The District Court Did Not Abuse Its Discretion in Denying the
### State's Motion to Phase Out the VITP

The State appeals from a district court order denying its motion for an order (1) directing that all parties and all court advisory panels immediately cease all efforts to recruit and admit new students into the VITP, and (2) relieving the State from any funding obligations as to such students.  We ruled against the State on a similar question only eight months ago and held that the district court did not abuse its discretion in denying the State's request.  Liddell, 105 F.3d at 1212.  No new arguments are advanced that cause us to change our position at this time.  Settlement negotiations are still ongoing.   At oral argument, counsel for the State asserted that settlement negotiations have reached an

---

[6]The County Districts maintained that, while they took no position regarding when the VITP might be phased out, a sufficient amount of "lead time" would be necessary to prevent disruption to students, parents, and staff as well as to preserve the interests of sound budgetary and operational management.  The United States contended that the settlement process should be permitted to run its course and that the State's Jenkins III motion was not yet ripe.  The Caldwell plaintiffs argued that the State had already lost its challenge to the continuation of the VITP and questioned the State's public posturing during the settlement process.  They maintained that the State had made no showing that the city schools, faculty, etc. were capable of absorbing returning students if the VITP were terminated.  The City Board argued that the State's motion should be denied because it undermined the settlement process, failed on the merits, and violated the mandate from Freeman v. Pitts, 503 U.S. 467 (1992), that requires a transition phase for the orderly withdrawal of court supervision.

impasse, but counsel for all the other parties disagreed. As all parties are bound by a district court order to maintain confidentiality and as the settlement coordinator has not yet filed a report indicating an impasse, we

can only assume the settlement coordinator is making every effort to resolve the many complex issues that must be addressed.[7]

It is important to bear in mind that the current school desegregation plan is based on a "unique and comprehensive settlement agreement" approved by this court sitting en banc in 1984. Liddell, 731 F.2d at 1297.[8] We note that all parties other than the State have indicated a willingness to continue essential elements of the plan, including the interdistrict transfer of black city students to the County Districts.

Settlement is the preferred method of resolving protracted school desegregation cases. As recently as

_____

[7]We note that as recently as September 10, 1997, the attorney general of the State of Missouri made public a new proposal to end the litigation. We assume the settlement director and all parties to this litigation were notified of the proposal and that this proposal, as well as others, will be considered by the parties in settlement negotiations.

[8]This desegregation plan resulted from a settlement agreement encouraged by the Honorable William L. Hungate, United States District Judge for the Eastern District of Missouri. In encouraging the parties to settle, he stated:

> Society's greatest opportunities lie in encouraging human inclinations toward compromise, rather than stirring our tendencies for competition and rivalry. If lawyers, educators, and public officials do not help marshall cooperation and design mechanisms that promote peaceful resolution of conflicts, we shall miss an opportunity to participate in the most creative social experiments of our time.

Liddell v. Board of Educ., 567 F. Supp. 1037, 1041 (E.D. Mo. 1983) (citation omitted).

1990 in considering the proposed settlement of the Little Rock School District desegregation case, we stated:

> The law strongly favors settlements. Courts should hospitably receive them. This may be especially true in the present context--a protracted, highly divisive, even bitter [desegregation] litigation, any lasting solution to which necessarily depends on the good faith and cooperation of all the parties, especially the defendants. As a practical matter, a remedy that everyone agrees to is a lot more likely to succeed than one to which the defendants must be dragged kicking and screaming.

Little Rock Sch. Dist. v. Pulaski County Special Sch. Dist. No. 1, 921 F.2d 1371, 1383 (8th Cir. 1990). Consistent with this court's preference, we recently approved a settlement agreement in the Kansas City School District desegregation case. Jenkins v. Missouri, No. 97-1968, slip op. at 35 (8th Cir. Aug. 12, 1997).[9]

Given the long history of state-mandated, segregated schools, the complexity of the issues, and the difficulty of developing a plan that will ensure that students of all races will have a continuing equal opportunity for a quality, integrated education, the district court did not abuse its discretion in denying the State's motion to phase out the voluntary transfer of black city students to the County Districts pending settlement negotiations.

---

[9]The general principle that the law favors settlement agreements has been recognized for over 100 years. See Williams v. First Nat'l Bank, 216 U.S. 582, 595 (1910) (compromises of disputed claims are favored by the courts) (citing Hennessy v. Bacon, 137 U.S. 78 (1890)). This principle is recognized in desegregation cases. Armstrong v. Board of Sch. Dirs., 616 F.2d 305, 313 (7th Cir. 1980)); Jones v. Caddo Parish Sch. Bd., 704 F.2d 206, 221 (5th Cir. 1983). See also Daniel J. McMullen and Irene Hirata McMullen, Stubborn Facts of History--The Vestiges of Past Discrimination in School Desegregation Cases, 44 Case W. Res. L. Rev. 75 (1993)).

There can be no doubt as to the complexity of the issues that need to be resolved either by settlement or court order. For example, over the course of several years, approximately 12,000 black city students per year have voluntarily transferred from city schools to county schools. Ending or phasing out this program will inevitably lead to

a significant increase in the black population of the St. Louis School District and may well result in the resegregation of the St. Louis schools through something other than a change in demographic factors. Moreover, the desegregation plan involves remedial programs, magnet schools, student assignments, teacher exchanges, and other programs designed to give students of all races an equal opportunity for a quality, integrated education, each of which must be independently considered pursuant to <u>Green v. New Kent County School Board.</u>, 391 U.S. 430 (1968), and <u>Freeman v. Pitts</u>, 503 U.S. 467 (1992). From the beginning, the plan has relied on state and city funding. All elements of the plan have been repeatedly subject to district and circuit court review, many of which became the subject of petitions for writs of certiorari to the United States Supreme Court. <u>See</u> note 1, <u>supra</u>. Under these circumstances, we do not believe that the district court abused its discretion in refusing the State's request to enjoin the parties and panels from immediately ceasing all efforts to recruit and admit new students into the VITP and relieve the State from any funding obligations as to such students pending settlement negotiations.

## The Unitary Status Motion

In the event the district court determines that an impasse in the settlement negotiations has been reached, it must then decide the State's pending motion to have the St. Louis School District declared unitary and determine the consequences that flow from that decision. In reaching these decisions, the district court shall be guided by the Supreme Court's decisions in <u>Freeman</u>,

<u>Dowell v. Board of Education of Oklahoma City Public Schools</u>, 498 U.S. 237 (1991), and <u>Green</u>.

It is clear from these decisions, particularly <u>Freeman</u> and <u>Dowell</u>, that the Supreme Court requires that once a school district has achieved unitary status, a district court should not deny that status to a school district because of demographic factors or changes since the desegregation plan was initiated. The Court made clear in <u>Dowell</u>

that on obtaining unitary status, the defendant school district would not return to its former ways.[10]

Herein lies the problem. The historical record reveals that significant progress has been made in providing equal opportunities through the programs that have been in effect for several years. As previously noted, if some or all of these programs are ended by a declaration that the St. Louis School District has achieved unitary status, then the immediate effect will most probably be a significant resegregation of the city schools. The inescapable result would be that approximately 12,000 black students would be reassigned to the city schools, thereby increasing the degree of segregation in those schools. Unlike the situation in Freeman and Dowell, the resegregation would not result from changed demographic factors. Moreover, segregation may very well be increased in the city schools if the magnet or remedial programs are either eliminated or limited in scope and the students are reassigned on the basis of neighborhood schools rather than on the current basis, which is designed to secure the maximum

---

[10]The Court stated that:

In the present case, a finding by the District Court that the Oklahoma City School District was being operated in compliance with the commands of the Equal Protection Clause of the Fourteenth Amendment, and that it was unlikely that the Board would return to its former ways, would be a finding that the purposes of the desegregation litigation had been fully achieved. No additional showing of 'grievous wrong evoked by new and unforeseen conditions' is required of the Board.

Dowell, 498 U.S. at 247.

desegregation practicable.[11]  We do not say and are not prepared to say at this time how the mandate of the Supreme Court, particularly in <u>Dowell</u> that

---

[11]It may well be, as <u>Freeman</u> points out, that some elements of the program are unitary and will remain so if that status is declared.  The Supreme Court states that each element is to be treated independently.  <u>Freeman</u>, 503 U.S. at 489.

resegregation should not result from a declaration of unitary status, can be achieved; but the issue is one that must be dealt with either in settlement negotiations or by district court order.

The State does not dispute the fact that ending the voluntary interdistrict transfer of black city students to the County Districts and limiting its other responsibilities will probably result in some resegregation of the city schools. Nor does it dispute that black students in St. Louis were either denied an education or limited to attending segregated schools for at least 140 years, resulting in savings to the St. Louis School District and the State. See Adams v. United States, 620 F.2d 1277 (8th Cir. 1980). Rather than address these issues, the State argues that it has expended large sums of money in the twenty years that this program has been in effect, it has done its share, and the time has come to end its responsibilities in the matter. In support of ending its obligations, the State points to the fact that it has initiated a number of programs that have particular benefit to disadvantaged city students[12] and has publicly proposed to settle its obligations by making a lump sum payment to the St. Louis School District.

The district court must take all of these factors into consideration in determining whether to grant full

---

[12]These programs include a comprehensive school improvement program, reading intervention programs, drug-free schools program, emphasis on early childhood education, early childhood programs, AIDS awareness education, unwed mothers' education, gun-free schools, provision of medical services to Medicaid-eligible school children, and Missouri's nationally-renowned "Parents as Teachers" program. See Mo. Rev. Stat. §§ 162.300; 167.268, .270, .294, .606; 191.668; 195.214; 571.030.

or partial unitary status and what the defendants' continuing obligations will be if such status is granted. We will not prejudge that matter or issue an advisory opinion. We merely repeat that the complexity of the issues involved support the view heretofore expressed that the best way to resolve these problems and provide a quality, integrated education to all city students is through good-faith settlement negotiations.

## The <u>Jenkins III</u> Issue

The State's principal argument is that the district court is without discretion in this matter and that <u>Jenkins III</u> requires that the VITP be phased out now. We do not agree that <u>Jenkins III</u> requires this result. A premise of <u>Jenkins III</u> was that the trial court specifically found that no interdistrict violation had taken place. No such determination has been made here.[13] To the contrary, from the beginning the plaintiffs asserted interdistrict violations. Rather than contest these allegations, the County Districts entered into a settlement agreement under which they agreed to accept a significant number of transfer students and in return were promised judgments relieving them from any possible constitutional violations. Under these circumstances, it would be wholly inappropriate for this court to make an initial determination with respect to an interdistrict violation.

Making such a determination would invade the province of the district court and would be unfair to the parties by denying them the opportunity, should it become necessary, to litigate the interdistrict violation issue. To require the County Districts to litigate this issue now, after voluntarily accepting thousands of city transfer students for twenty years, would violate their fundamental right to due process. The plaintiffs would

---

[13]Justice O'Connor stated in <u>Jenkins III</u> in discussing the Kansas City School District, "Neither the legal responsibility for nor the causal effects of . . . racial segregation transgressed its boundaries, and absent such interdistrict violation or segregative effects, <u>Milliken</u> and <u>Gatreaux</u> do not permit a regional remedial plan." <u>Jenkins III</u>, 115 S. Ct. at 2059 (O'Connor, J., concurring).

be equally deprived if they were denied the opportunity to prove interdistrict violations.  Moreover, the fundamental and undisputed fact remains that the State has been found to be the primary constitutional violator, and this court has consistently held in panel and in en banc opinions that the State could be required to fund the VITP.  See note 1, supra.  Even if it were appropriate for us to address that issue today, however, this court could not make a proper determination without a complete record.  In order

34

to apprehend fully the constitutional violations as they existed many years ago, we must employ something more rigorous than hindsight, guesswork, and speculation.

In Jenkins III, Chief Justice Rehnquist, speaking for the Court, stated that the Kansas City desegregation plan was grounded in "improving the desegregative attractiveness of the" Kansas City, Missouri School District (KCMSD). Jenkins III, 115 S. Ct. at 2050. Here, neither "desegregative attractiveness" nor "suburban comparability" were the basis of the settlement agreement or the district court's or this court's approval of the settlement plan. Rather, the plan was premised on the fact that both the State and the County Districts opposed consolidation of the city and county districts and a voluntary transfer plan could and would be an integral factor in desegregating the city schools. Everyone but the State agreed to this solution, and it offered no alternative designed to secure the black city students an opportunity for an equal education. The premise has proven valid, and the St. Louis schools have achieved a high degree of integration.

We also note that Justice O'Connor, who concurred in the plurality opinion in Jenkins III, stated that the district court found "that the segregative effects of KCMSD's constitutional violation did not transcend its geographical boundaries." Jenkins III, id. at 2060. As previously noted, there has been no such finding in this case. Indeed, the parties are still at odds as to whether interdistrict violations occurred; and rather than have this argument resolved after lengthy litigation, the plaintiffs, the City Board, the County Districts, and the United States agreed to the VITP.

35

Justice O'Connor also noted the limited nature of the Jenkins III decision and remand, stating that "[t]he Court today discusses desegregative attractiveness only insofar as it supports the salary increase order under review, . . . and properly refrains from addressing the

propriety of all the remedies that the District Court has ordered, revised, and extended in the 18-year history of this case." Id. at 2061.[14]

There is, of course, language in the majority opinion in Jenkins III suggesting that no interdistrict relief can be granted unless an interdistrict violation or segregative effects have been proved. This language must be tempered by the facts in Jenkins III and limited nature of the actual holding. In our view, the question remains sufficiently open to permit us to follow our numerous precedents and hold that Jenkins III does not require us to hold that the VITP must be terminated or phased out at this time.

## Conclusion

We affirm the order of the district court denying the State's motion to end all efforts to recruit and admit new students into the VITP for the 1997-98 school year. The district court did not abuse its discretion in denying the State's motion to phase out the voluntary transfer of black city students to the County Districts pending settlement negotiations. Its decision to do so was not contrary to the Supreme Court's decision in Jenkins III. We renew our encouragement to the parties to make every effort to resolve this matter so that

---

[14]The district court determined that the KCMSD had attained unitariness in only one of the five aspects enumerated in Green, 391 U.S. at 435. Jenkins v. Missouri, No. 77-0420-CV-W-RGC, slip op. at 28-37, 59 (W.D. Mo. Mar. 25, 1997). We affirmed the district court's order. Jenkins v. Missouri, No. 97-1968, slip op. (8th Cir. Aug. 12, 1997).

students of all races will have a continuing equal opportunity for a quality, integrated education. In the unfortunate event that the negotiations reach an impasse, the district court should promptly rule on the pending unitary status motion.

A true copy.

    Attest.

        CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.